[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-16227

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
July 27, 2009
THOMAS K. KAHN
CLERK

D.C. Docket No. 08-21428-CV-CMA

PAUL BABINEAU,
KENNY BOSELY, et al.,

Plaintiffs-Appellants,

Versus

FEDERAL EXPRESS CORPORATION,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 27, 2009)

Before MARCUS and PRYOR, Circuit Judges, and EDENFIELD,[*] District Judge.

EDENFIELD, District Judge:

_____

[*] Honorable B. Avant Edenfield, United States District Judge for the Southern District of Georgia, sitting by designation.

Plaintiffs, who are hourly employees of defendant Federal Express Corporation, Inc. ("FedEx"), appeal the district court's denial of class certification. They assert claims of breach of contract and unjust enrichment resulting from FedEx's failure to pay employees for "all hours worked." The district court concluded that certification was improper primarily because individualized factual inquiries into whether and how long each employee worked without compensation would swamp any issues that were common to the class. The sole question before this Court is whether the district court abused its discretion in declining to certify the class. We hold that the district court acted within the bounds of its discretion and affirm its decision.

I.     BACKGROUND

In what might be characterized as "Round Two" of their litigation against FedEx for its compensation practices, Plaintiffs allege that FedEx has engaged in a pervasive and long-standing policy of failing to pay hourly employees for all time worked. Previously, the district court denied certification of a nationwide class of FedEx employees asserting substantially similar claims in *Clausnitzer v. Federal Express Corp.*, 248 F.R.D. 647 (S.D. Fla. 2008). Plaintiffs subsequently brought this suit which attempts to address the defects identified in *Clausnitzer* by limiting

the scope of the class to Florida employees, adding a claim for quantum meruit, and altering the theory of their breach of contract claim.

Plaintiffs seek to certify a class defined as "All employees of [FedEx] paid on an hourly basis as nonexempt employees, who were employed in the state of Florida, from the maximum time period preceding the filing of this complaint, as permitted by the statute of limitation, until such time as the Class period closes." The class includes couriers, courier/handlers, service agents, and any other non-exempt employees who are, or were, required during the class period to punch in and out on a manual time clock, but were paid only from their scheduled start time to their scheduled end time. The class also includes employees who worked during unpaid breaks.

Plaintiffs claim that FedEx breached their contracts by failing to pay for three categories of time worked: (1) the interval between an employee's manual punch in time and his scheduled start time; (2) the interval between an employee's scheduled end time and his manual punch out time; and (3) the time worked during unpaid breaks. They also assert a claim for quantum meruit. [1]

**A. The Contract**

---

[1] Plaintiffs also assert a claim for unjust enrichment, but did not seek certification with respect to that claim, so it is not before the Court.

Plaintiffs claim that their employment relationship with FedEx is governed by an express contract which requires FedEx to pay for "all time worked." This contract and its terms are allegedly embodied in several documents including a standard written agreement (the "Agreement") that every FedEx employee signs during the employment application process as well as certain FedEx employment manuals. The Agreement contains a statement that "all terms of my employment except to the extent covered specifically by this contract or any other valid contract between Company and me ... shall be determined and governed by Company's Policies and Procedures Manual as same may be amended from time to time hereafter...."

FedEx publishes or otherwise provides employees with a "People Manual" and an "Employee Handbook."[2] Both manuals state, "It is the policy of FedEx [] to compensate for all time worked in accordance with applicable state and federal law." In the People Manual, the next sentence states, "Except for certain approved preliminary and post-liminary activities, no employee should perform work 'off the clock' for any reason, whether on their own initiative or at the request of management." Each manual contains an express disclaimer that it is not a contract

---

[2] The "People Manual" appears to be an alternative name for FedEx's "Personnel Policy and Procedures Manual" which the Agreement references. It is unclear how the "Employee Handbook" could be incorporated into the Agreement, when the Agreement references only the People Manual. Nevertheless, the parties cite to both manuals, and thus, we consider both in our analysis.

and its provisions should not be read or implied to provide for one.[3]  Furthermore, upon receipt of the Employee Handbook, each employee signed an acknowledgment that the Handbook does not create a contract.[4]

Plaintiffs conceded at oral argument that under Florida law the manuals do not themselves create a contract.  Rather, they argue that the Agreement signed during the application process creates the contract and that the Agreement expressly incorporates the manuals' terms.  FedEx disputes the existence of any express employment contract.  However, even if the Agreement constitutes an at-will employment contract, FedEx contends that under Florida law the terms in its policy manuals do not create any contractual rights.

## B. Timekeeping

An understanding of Plaintiffs' claims requires an understanding of FedEx's time-keeping procedures.  FedEx employs three methods of tracking time.  First,

---

[3] The People Manual states: "This manual is intended solely as a guide for management and employees during employment.  It is not a contract of employment, and no such contract may be implied from its provisions."

The Employee Handbook states: "Disclaimer: The FedEx [] Employee Handbook is not a contract of employment, nor should its provisions be read or implied to provide for one.  Your employment is at-will.  Your specific rights as an employee are governed by the employment agreement you signed in your employment application.  For more specific guidelines, refer to the People Manual and Your Employee Benefits book."

[4] The acknowledgment states, "I understand that The Federal Express Employee Handbook contains guidelines only and that the Company can modify this publication by amending or terminating any policy, procedure, or employee benefit program at any time."

employees track their time by entering various codes corresponding to different work activities into a hand-held computerized tracking device (a "tracker"). Employees manually enter into the trackers their scheduled start times and end times as well as the times at which they start and finish a break. The tracker data is transmitted to FedEx's payroll database and is used to calculate employee compensation. Additionally, as a backup for the tracker data, employees manually write on a time card the time codes for each task, as well as the start and end time for that task.

FedEx also requires employees to punch in and out on a manual punch clock before and after their shifts. Until 2007 the trackers did not automatically time stamp the employees' entries, so an employee who was supposed to commence work at 8:00 a.m. but arrived for work at 8:05 a.m. could hide his tardiness by entering an 8:00 a.m. start time into the tracker. Thus, FedEx claims that the manual punch records were simply used to verify the integrity of time entries that employees entered into the trackers. FedEx paid its employees only for the time between the scheduled start and end times as entered into the trackers, which did not necessarily coincide with employees' manual punch in and punch out times. The periods of time between the start/end times entered into the tracker and the punch in/out times are referred to as "gap periods." Thus, if an employee

punched in at 7:45 a.m. but entered a start time of 8:00 a.m. into the tracker, there would be a fifteen minute gap period for which the employee would not be paid. Additionally, FedEx required employees to take an unpaid break (the "break period") during the day, but Plaintiffs claim that employees frequently worked during their breaks. Plaintiffs seek compensation for work that they performed during gap periods and break periods.

### C. Gap Periods

Plaintiffs allege that FedEx structures employees' workloads such that it is usually impossible for its hourly employees to perform all necessary pre- and post-liminary tasks during their scheduled shifts. Thus, they argue, FedEx *requires* employees to perform certain work activities during the gap periods. These activities vary according to the job function of the particular employee but include retrieving the tracker and keys to the truck, gathering equipment and supplies, finishing paperwork, and completing closing procedures. For example, plaintiff Kenny Bosley stated that he spent "time gathering [his] equipment and preparing to work [his] route" during the pre-shift gap periods. During post-shift gap periods, he stated that he performed unpaid duties including logging off from the tracker system, punching out on the time clock, and other unspecified end of day duties. Plaintiff Larry Horton stated that the work he performed during gap

7

periods "included getting equipment, truck keys, going to [the] truck, participating in a meeting if a meeting was scheduled, and other kinds of pre-trip activities...." Furthermore, Plaintiffs allege that from the moment they punched in to the moment they punched out, hourly employees were under the control of FedEx, and, if asked to perform a task, they had to do so.

FedEx has submitted evidence that employees punched in at different times and for different reasons. For example, one employee stated that she arrived early to avoid traffic or because she had to drop her child off at school. Another employee arrived early simply because he "didn't like to rush." After manually punching in, some employees drank coffee, chatted with their co-workers, talked on their phones, or simply relaxed. FedEx claims, and certain Plaintiffs have confirmed, that there was no policy requiring employees to manually punch in until their scheduled start time. As for the post-shift gap period, FedEx claims that employees who remained punched in after their scheduled stop time did so for a variety of reasons. For example, one employee stated that during the post-shift gap period he "may [have] stop[ped] to talk to coworkers" but did not "expect to be paid for this time because [he was] not working."

FedEx claims that published policies and procedures established that employees would be paid based on scheduled start and end times, not manual

punch times. It has submitted evidence that employees, including plaintiff Bosley, understood that they would be paid based on the times entered into the trackers. Bosley also stated that he was never directed by FedEx managers to work off-the-clock nor did he know of any FedEx managers who were aware that he had worked off-the-clock. FedEx alleges that if it ever required employees to work outside their scheduled shifts, then the employees were paid for such time.

Both parties submitted statistical analysis of FedEx time data. Plaintiffs' expert, Dr. Richard Drogin, studied data that had been obtained from FedEx in the previous *Clausnitzer* nationwide class action. He compared tracker data to manual punch records and concluded that employees, on average, had 8.1 minutes of gap time per shift. FedEx's expert, Dr. Michael P. Ward, found that for the pre-shift gap period, the median amount of time was 4 minutes and the average amount of time was 9 minutes. For the post-shift gap period, Dr. Ward found the median time to be 0 minutes and the average to be 2.7 minutes.

## D. Break Periods

Plaintiffs assert that employees regularly worked without compensation during their break periods and that FedEx knew or should have known that this was occurring. Plaintiffs Babineau, Bosley, and Horton stated that they worked during unpaid breaks, and Plaintiffs have submitted declarations from other

employees indicating that they regularly worked during breaks.  Plaintiffs claim that such work can be proven by analyzing tracker records.  In addition to recording employees' break times (entered manually by each employee), trackers are also used to scan packages as they move through the delivery process.  These package scans, unlike break time entries, are automatically stamped by the tracker's internal clock.  Thus, Plaintiffs claim that determining whether an employee worked during his break is as simple as comparing the break times to package scan times to see if packages were delivered or picked-up during the times that an employee entered for his break.

FedEx responds that the tracker data are insufficient to prove the existence or extent of work performed during breaks.  It argues that the tracker records may not accurately reflect the times at which breaks occurred because employees frequently input their break times into the tracker at the end of the day.[5]  Relying on faulty memories and estimations as to when they actually took their break, employees may have inadvertently created an overlap between the break period they entered into the tracker and the package scan times.  To support this assertion, FedEx notes that some employees testified that they did not work during their breaks even though their tracker records reflect package scans during breaks.

---

[5] A study conducted by FedEx's engineers found that over 40% of all break codes were entered by employees after the employee actually took the break, although this practice was discouraged.

Furthermore, while the data show the number of package scans that may have occurred during a recorded break period, they do not show the duration of the work related to those scans.

FedEx also argues that if employees did perform work during their breaks, they did so in violation of FedEx's policies. FedEx's Employee Handbook states, "Employees are not expected to or allowed to work during their meal breaks." FedEx points to employee declarations that they did not work during unpaid breaks and that they understood that such work was prohibited by FedEx policy. FedEx contends that if exigencies requiring an employee to work during a break ever arose, the employee could have obtained approval to work and would have been paid for that work. For example, Plaintiff Bosley testified that, on occasion, he sought and received management approval to work in lieu of taking a break and that he was paid for his time. On other occasions, he did not obtain approval and therefore did not work during the break.

As to the frequency of interrupted breaks, the parties again present competing expert analyses. Plaintiffs' expert Dr. Drogin conducted a study and concluded that package scans occurred during 17.6% of unpaid breaks. Defense expert Dr. Ward analyzed tracker data and arrived at a 9.4% break-interruption rate after excluding scans occurring in the first or last minute of the break period.

11

He also found that a small minority (10%) of employees accounted for almost half (47.7%) of the interrupted breaks.

## II.   STANDARD OF REVIEW

We review the district court's decision whether to certify a class under Federal Rule of Civil Procedure 23 for an abuse of discretion. *Klay v. Humana, Inc.*, 382 F.3d 1241, 1251 (11th Cir. 2004). It is irrelevant whether this Court would have granted certification, and "[a]s long as the district court's reasoning stays within the parameters of Rule 23's requirements..., the district court decision will not be disturbed." *Hines v. Widnall*, 334 F.3d 1253, 1255 (11th Cir. 2003). "A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous." *Klay*, 382 F.3d at 1251.

## III.   CLASS CERTIFICATION STANDARDS

To obtain class certification under Rule 23, the Plaintiffs must meet each of the requirements specified in Rule 23(a), as well as at least one of the three subsections of Rule 23(b). Fed.R.Civ.P. 23; *Klay,* 382 F.3d at 1250. Rule 23(a) requires plaintiffs to demonstrate that the proposed class satisfies the prerequisites of "numerosity, commonality, typicality, and adequacy of representation." *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1187-88 (11th Cir. 2003)

(citation omitted); Fed.R.Civ.P. 23(a).  Plaintiffs seek class certification under Rule 23(b)(3).  To certify a Rule 23(b)(3) class, the Plaintiffs must demonstrate (1) that questions of law or fact common to class members predominate over any questions affecting only individual members ("predominance"); and (2) that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy ("superiority").  Fed.R.Civ.P. 23(b)(3); *Vega v. T-Mobile U.S.A., Inc.*, 564 F.3d 1256, 1265 (11th Cir. 2009).  Alternatively, Plaintiffs seek certification under Rule 23(b)(1)(A) which requires them to show that "prosecuting separate actions ... would create a risk of inconsistent or varying adjudications ... that would establish incompatible standards of conduct for the party opposing the class."  Fed.R.Civ.P. 23(b)(1)(A).

"Although the trial court should not determine the merits of the plaintiffs' claim at the class certification stage, the trial court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied."  *Valley Drug*, 350 F.3d at 1188 n.15 (citing *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 160, 102 S. Ct. 2364, 2372, 72 L. Ed. 2d 740 (1982));  *see also Vega,* 564 F.3d at 1265.  "It is inescapable that in some cases there will be overlap between the demands of [Rule] 23(a) and (b) and the question of whether [a] plaintiff can succeed on the merits."  *Huff v. N.D. Cass*

13

*Co. of Ala.*, 485 F.2d 710, 714 (5th Cir. 1973) (en banc).[6]  Thus, the principle that

district courts should not evaluate the merits of plaintiffs' claims "should not be

talismanically invoked to artific[i]ally limit a trial court's examination of the

factors necessary to a reasoned determination of whether a plaintiff has met her

burden of establishing each of the Rule 23 class action requirements." *Love v.*

*Turlington*, 733 F.2d 1562, 1564 (11th Cir. 1984); *see also Coopers & Lybrand v.*

*Livesay*, 437 U.S. 463, 469 & n.12, 98 S. Ct. 2454, 2458 & n. 12, 57 L. Ed. 2d 351

(1978) ("[T]he class determination generally involves considerations that are

'enmeshed in the factual and legal issues comprising the plaintiff's cause of

action.' ... 'The more complex determinations required in Rule 23(b)(3) class

actions entail even greater entanglement with the merits.'") (emphasis and

citations omitted).  While we avoid merits determinations to the extent practicable,

this case does require the Court to look beyond the pleadings and examine the

parties' claims, defenses, and evidence to ensure that class certification would

comport with Rule 23's standards.

## IV.   DISCUSSION

While the Rule 23(a) requirements of numerosity, commonality, typicality,

and adequacy of representation must be considered in any class certification

---

[6] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

decision, the district court assumed for argument's sake that Plaintiffs had satisfied these requirements. Because the propriety of certification hinges on other factors, we accept this assumption and focus on whether certification would comport with Rule 23(b). We first evaluate the district court's denial of Rule 23(b)(3) certification of Plaintiffs' breach of contract and quantum meruit claims. We then consider the denial of certification under Rule 23(b)(1)(A).

## A. Rule 23(b)(3)

The district court concluded that class certification was improper under Rule 23(b)(3). To obtain Rule 23(b)(3) class certification "the issues in the class action that are subject to generalized proof and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof." *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1557-58 (11th Cir. 1989) (quotations and citation omitted). "Common issues of fact and law predominate if they 'ha[ve] a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief.'" *Klay*, 382 F.3d at 1255 (quoting *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 699 (N.D. Ga. 2001)). On the other hand, common issues will not predominate over individual questions if, "as a practical matter, the resolution of [an] overarching common issue breaks down into an unmanageable variety of

15

individual legal and factual issues." *Andrews v. Am. Tel. & Tel. Co.*, 95 F.3d 1014, 1023 (11th Cir. 1996). Certification is inappropriate if the "plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims." *Klay*, 382 F.3d at 1255 (citing *Perez v. Metabolife Int'l, Inc.*, 218 F.R.D. 262, 273 (S.D. Fla. 2003)). The predominance inquiry requires an examination of "'the claims, defenses, relevant facts, and applicable substantive law,' ... to assess the degree to which resolution of the classwide issues will further each individual class member's claim against the defendant." *Id.* at 1254 (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir.1996).

The district court concluded that predominance was not satisfied because "adjudication of Plaintiffs' claims on a class basis would be swamped by individual factual inquiries into the activities of each employee during the gap periods or during breaks." As the gap periods and the break periods raise different issues, we examine the claims for each of these periods in turn.

### 1. Gap Periods

The district court concluded that individualized proof would be required to determine whether employees were actually working during the pre- and post-shift gap periods. In reaching this conclusion, it quoted the reasoning of its prior order in *Clausnitzer*, in which it denied certification for a nationwide class.

> With respect to gap period work, there are innumerable reasons why an employee may have arrived at the FedEx facility early on any given day. While those reasons may in fact relate to completing work, they may also relate to a plethora of non-work activities such as socializing, checking e-mail, beating traffic, etc. Likewise, the end of day gap periods may also have been the result of employees staying late at the facility to engage in non-work related activities. FedEx has offered statements and testimony of a number of employees who have provided such plausible explanations for what occurred during the gap periods. The statistical evidence proffered by Plaintiffs does not account for time spent doing activities other than work and cannot alone establish that work was performed. Permitting these claims to proceed as a class action would deprive FedEx of the ability to explore whether an individual employee was engaged in non-work activities during the gap period and would thus limit FedEx's ability to properly defend the claims.

*Babineau v. Federal Express*, No. 08-21428, slip op. at 19 (S.D. Fla. 10/2/08) (quoting *Clausnitzer*, 248 F.R.D. at 661-62).

The district court also relied on the strikingly similar case of *Cornn v. United Parcel Service, Inc.*, 2005 WL 2072091 (N.D. Cal. 8/26/05) (unpublished), in which plaintiffs made virtually identical claims against FedEx's competitor, United Parcel Service ("UPS"). There, the plaintiffs alleged that UPS did not pay its hourly employees for the time period between

17

punching in and their scheduled start time. *Id.* at \*1. UPS presented evidence that employees arrived at different times and often performed a variety of non-work related activities during the gap time, that it had no policy requiring employees to regularly come in prior to their scheduled start times, that it instructed employees not to work prior to their scheduled start times, and that it had paid employees on those occasions where they were required to work outside their scheduled shift. *Id.* at \*4-5. The *Cornn* court denied class certification on the basis that "[it could not] determine whether a driver performed work during the interval in question without undertaking individualized inquiries that predominate over common questions...." *Id.* at \*5.

Here, the district court reasonably concluded that punch clock records do not provide common proof of any uncompensated work during gap periods – particularly in light of employee testimony regarding the various non-work-related activities that took place during the gap periods and the various personal reasons that employees listed for coming in early and staying late.[7] Furthermore, assuming the existence of a contract, the district court acknowledged that FedEx may mount an individualized defense that an

---

[7] Plaintiffs also allege that the district court erred by not adopting a presumption that employees who were still punched in after the end of their shifts were working. The district court's refusal to presume a material fact that Plaintiffs are required to prove – *i.e.*, whether employees were working during a period of time for which they were not compensated – was certainly not an abuse of discretion.

employee knew of FedEx's policy prohibiting off-the-clock work and chose to engage in it anyhow in breach of that contract. *See Babineau,* No. 08-21428, slip op. at 17-18 (citing *Basco v. Wal-Mart Stores, Inc.*, 216 F. Supp. 2d. 592, 603 (E.D. La. 2002) (whether employee knew of Wal-Mart policy prohibiting off-the-clock work and chose to engage in it anyhow was individualized issue that precluded class certification in breach of employment contract action)).

In an attempt to circumvent these individualized issues, Plaintiffs assert an alternative theory of their case based on the employment manual provision that FedEx will pay its employees for "all time worked in accordance with applicable state and federal law." Under Plaintiffs' theory, FedEx must pay for "all hours worked" as that term is defined by federal law, specifically the Fair Labor Standards Act ("FLSA") and related federal regulations. Those regulations state that "hours worked" includes "[i]n general … all periods in which the employee is suffered or permitted to work whether or not required to do so" and "time given by the employee to the employer even though part of the time may be spent in idleness." 29 C.F.R. § 4.178; 29 C.F.R. § 778.223. Thus, according to Plaintiffs, it matters not whether an employee was drinking coffee, socializing, or checking his e-mail during the gap periods instead of performing "work-related" activities. Rather, an employee is "suffered or permitted to work" from the moment he

punches in, because from that moment hourly employees are under the control of FedEx. Moreover, under this theory, the FedEx policy prohibiting off-the-clock work could not be asserted as an individualized defense, because employees were "on-the-clock" as soon as they punched in. Plaintiffs assert that all individualized issues vanish when the FLSA is incorporated into the contract.

The district court was not persuaded that FedEx's policies and procedures manuals incorporated FLSA regulations, reasoning that the regulations were designed to govern minimum wage and overtime obligations – not to control the terms of employment contracts. However, even assuming that these regulations were incorporated into the alleged contract via the employment manuals, the district court noted that individualized issues might remain.

FedEx has highlighted such issues. If the FLSA regulations are applicable, then Plaintiffs may not cherry-pick only those regulations that work in their favor. Another FLSA regulation, 29 C.F.R. § 785.48(a), specifically governs situations in which employees punch in early or punch out late. It states: "In those cases where time clocks are used, employees who voluntarily come in before their regular starting time or remain after their closing time, do not have to be paid for such periods provided, of course, that they do not engage in any work. Their early or late clock punching may be disregarded." 29 C.F.R. § 785.48(a). Pursuant to this

regulation, it would appear that the court would still have to conduct individualized inquiries into whether each employee voluntarily arrived early or stayed late and whether he engaged in any work.

Plaintiffs respond that it is a common question of fact as to whether FedEx had a policy requiring employees to arrive early or stay late in order to perform work-related tasks without compensation. Specifically, they claim that FedEx had established unrealistic expectations for its employees which required them to work outside their scheduled shifts in order to complete their assigned tasks. Proving the existence of such a policy, they claim, would establish breach of contract liability on a class-wide basis. However, we have in the past held that proving the existence of a general policy may not be sufficient to establish that a defendant is liable to individual class members. *See Klay,* 382 F.3d at 1264 (finding that common issues did not predominate in breach of contract class action where allegations of defendants' policy to underpay doctors were "at best, merely circumstantial evidence tangentially related to each individual plaintiff's breach of contract claim" and did "nothing to establish that any individual doctor was underpaid on any particular occasion."); *Jackson v. Motel 6 Multipurpose, Inc.,* 130 F.3d 999, 1006 (11th Cir. 1997) (allegations that defendant had policy or practice of racial discrimination failed to establish predominance because proof of

21

such a policy would not establish whether defendant actually discriminated against any individual plaintiff); *Ramirez v. DeCoster*, 194 F.R.D. 348, 353 (D. Me. 2000) (holding that plaintiffs "do not necessarily satisfy the requirement that questions of law or fact predominate merely by alleging a pattern or practice claim") (cited in *Klay*, 382 F.3d at 1264).

Here, it is reasonable to conclude that the existence of a policy requiring or encouraging employees to arrive early or stay late would not predominate individualized issues. Even if FedEx policies pressured some employees to arrive early or stay late, it is clear from the record that other employees did so voluntarily and for purely personal reasons. The record also indicates that employees could request permission to work outside their shift (and be paid for doing so) if they needed extra time to complete their duties. Thus, proving that FedEx had a policy of holding its employees to efficiency standards that were difficult to meet would not prove that FedEx required any individual class member to work without pay. Under the facts of this case, it was not an abuse of discretion to conclude that proof of such a policy would not predominate over individualized issues.

## 2. *Break Periods*

The individualized issues that could take over this litigation are even more apparent with respect to the break period claims. As the district court reasoned:

[I]ndividual issues are apparent with respect to Plaintiffs' claimed work during unpaid breaks. Many employees, including named Plaintiffs, stated they did not work during unpaid breaks, although their time records indicate scans occurring during breaks. These scans could be evidence that work was being performed during the break, but could also have been caused by the after-the-fact entry of break codes into the electronic time system. Moreover, in the event an employee did work during unpaid breaks, individual inquiries would be necessary to determine the amount of time actually spent. FedEx has explained that scanning a package can take between two and twenty seconds depending on the complexity of the transaction. However, the time records produced by FedEx and studied by Plaintiffs' expert to develop his opinion only show the number of scans that occurred during a break, not how long the employee was allegedly working when the scan occurred. Determining the amount of actual work that occurred in conjunction with the scans or whether any work was actually completed would be an inquiry individual to each employee who had scans during unpaid breaks.

*Babineau*, No. 08-21428 slip op. at 19 (quoting *Clausnitzer*, 248 F.R.D. at 662) (internal citations omitted).

This reasoning is sound. There is simply no way to tell from the tracker data how long an employee worked during a break. Furthermore, the concerns about the accuracy of the data suggest that the data might not be sufficient to prove that an employee actually worked during a break, and therefore, further individualized inquiries might be necessary.[8] Finally, FedEx has indicated that it would raise the individualized defense that, assuming a contract existed, an

[8] Plaintiffs allege that the district court erred by "weighing" the findings of the parties' statistical experts at the class certification stage. However, the district court merely considered the nature of the common data upon which Plaintiffs intend to rely and assessed whether it would be sufficient to prove their claims.

employee who worked during the break violated its terms and breached the contract himself. The district court did not abuse its discretion in denying certification of the break period claims.

### 3. *Quantum Meruit*

The district court did not abuse its discretion in holding that Plaintiffs' quantum meruit claims failed to satisfy Rule 23(b)(3)'s predominance requirement. Under Florida law, "[t]o satisfy the elements of quantum meruit, a plaintiff must ... show that the plaintiff provided, and the defendant assented to and received, a benefit in the form of goods or services under circumstances where, in the ordinary course of common events, a reasonable person receiving such a benefit normally would expect to pay for it." *W.R. Townsend Contracting, Inc. v. Jensen Civil Const., Inc.*, 728 So. 2d 297, 305 (Fla. Dist. Ct. App. 1999). "Quantum meruit damages cannot be awarded upon the singular determination that the requesting party is deserving." *May v. Sessums & Mason, P.A.*, 700 So. 2d 22, 28 (Fla. Dist. Ct. App. 1997). Rather, "a claim for quantum meruit requires that plaintiffs demonstrate an expectation of compensation...." *Tooltrend, Inc. v. CMT Utensili, SRL*, 198 F.3d 802, 806 (11th Cir. 1999); *see also Tobin & Tobin Ins. Agency, Inc. v. Zeskind*, 315 So. 2d 518, 520 (Fla. Dist. Ct. App. 1975) (court must

24

determine whether "services were performed under circumstances in which the parties understood and intended that compensation was to be paid").

Thus, a quantum meruit claim is highly individualized and would require an inquiry into whether each employee expected compensation for non-work-related tasks or for activities performed while he was supposed to be on break. Also relevant to this inquiry would be each employee's familiarity with FedEx's policy that employees were to be paid based upon the times entered into the tracker, not manual punch times. We agree that these are individualized questions which are not suitable for class-wide adjudication.

## B. Rule 23(b)(1)(A)

Plaintiffs also moved for class certification under Fed.R.Civ.P. 23(b)(1)(A) which provides for class adjudication where there is a risk that conflicting or varying judgments in separate lawsuits would establish incompatible standards of conduct for the party opposing the class. Fed.R.Civ.P. 23(b)(1)(A). Because the risk that judicial action will create incompatible standards of conduct is low when a party seeks compensatory damages, only actions seeking declaratory or injunctive relief can be certified under Rule 23(b)(1)(A). *In re Dennis Greenman Sec. Litig.*, 829 F.2d 1539, 1545 (11th Cir. 1987).

25

Here, Plaintiffs seek limited injunctive relief in the form of a "permanent injunction restraining defendant from continuing to require and accept labor from hourly employees without pay...." However, the primary remedy sought in this case is unquestionably monetary relief for past failure to compensate employees. We held in *Cohen v. Office Depot, Inc.*, 204 F.3d 1069, 1078 n.7 (11th Cir. 2000), that Rule 23(b)(1)(A) certification was improper when plaintiffs requested both compensatory damages and injunctive relief. In light of *Cohen*, the district court noted that Rule 23(b)(1)(A) certification would appear to be improper. We agree.

## V.   CONCLUSION

For the foregoing reasons, we find that the district court's denial of class certification was not an abuse of discretion. The district court's judgment is **AFFIRMED**.