[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-12733
_____

D.C. Docket No. 3:10-cv-00191-WKW-WC

WALTER BUSSEY, et al.,

Plaintiffs,

DOLLIE WILLIAMS,
DAVID M. PALMER, II,
ROBIN PAIGE,

Plaintiffs - Appellees,

versus

MACON COUNTY GREYHOUND PARK, INC.,
d.b.a. Quincy's 777,
d.b.a. Victoryland, et al.,

Defendants,

MULTIMEDIA GAMES, INC.,
IGT,
BALLY GAMING, INC.,

Defendants – Appellants.

_____

Appeal from the United States District Court
for the Middle District of Alabama
_____

(April 2, 2014)

Before HULL and BLACK, Circuit Judges, and SMITH,[*] District Judge.

PER CURIAM:

Plaintiffs-appellees Dollie Williams, David M. Palmer, II, and Robin Paige (collectively, "appellees") filed a putative class action against the following defendants:  (1) Macon County Greyhound Park, Inc. d/b/a "Victoryland" and "Quincy's 777," a dog racing facility and gaming park in Macon County, Alabama ("Victoryland"); (2) Milton E. McGregor, the President and Chief Operating Officer of Victoryland; (3) Multimedia Games, Inc.; (4) IGT; and (5) Bally Gaming, Inc. ("Bally").  The last three defendants (collectively, "the Manufacturers") are the manufacturers, owners, and operators of electronic bingo machines that were in use at Victoryland during the time period relevant to this case.  Appellees, all of whom had played on the bingo machines, asserted that

_____

[*] Honorable C. Lynwood Smith, Jr., United States District Judge for the Northern District of Alabama, sitting by designation.

2

operation of the machines constituted illegal gambling activity.[1]  They sought recovery of all money they lost while playing on the machines during the six months preceding the filing of the lawsuit, pursuant to an Alabama statute providing that:

> All contracts founded in whole or in part on a gambling consideration are void.  Any person who has paid any money or delivered any thing of value lost upon any game or wager may recover such money, thing, or its value by an action commenced within six months from the time of such payment or delivery.

Ala. Code § 8-1-150(a) (1975).

The district court granted appellees' motion for class certification, designating Dollie Williams, David M. Palmer, II, and Robin Paige as class representatives, and certifying a class of:  "All persons who, at any time during the period beginning September 4, 2009 through and including February 1, 2010, while using their Q-Club cards, lost money or value playing electronic 'bingo' at Macon County Greyhound Park, commonly known as Victoryland."  All defendants petitioned for permission to appeal pursuant to Federal Rule of Civil Procedure 23(f), but this court granted the petition only as to the Manufacturers.

---

[1] *See* Ala. Const., Art. IV, § 65 ("The legislature shall have no power to authorize lotteries or gift enterprises for any purposes, and shall pass laws to prohibit the sale in this state of lottery or gift enterprise tickets, or tickets in any scheme in the nature of a lottery; and all acts, or parts of acts heretofore passed by the legislature of this state, authorizing a lottery or lotteries, and all acts amendatory thereof, or supplemental thereto, are hereby avoided.")

After review of the record and the briefs of the parties, and having the benefit of oral argument, we reverse.

## I. BACKGROUND

### A.    Operation of the Bingo Machines and "Q-Cards"

In order to play electronic "bingo" at Victoryland, a player must first insert some thing of value — *e.g*., cash, a "house card" tied to an account number (but not a specific person), or a ticket representing credits obtained from earlier play — into a bingo terminal. A player could not play unless at least one other player already was playing on a different machine, because players effectively played against each other. A single game lasted only a few seconds, and one player won each game.

Sometimes, a player would also insert a "Q-Card" into the machine before playing. A Q-Card was a loyalty card that allowed players to earn bonuses and perks, while in turn providing Victoryland the ability to track demographic information about players for marketing purposes. Each Q-Card was associated with a specific individual and a specific player number. Even so, Q-Card use was optional — not all players possessed Q-Cards, and not all players who had such cards were required to use them each time they played electronic bingo. In fact, not every bingo machine at Victoryland was equipped with a Q-Card reader.

Moreover, a Q-Card did not represent value. A player could not use the card to add value to the machine, or to extract any winnings.

Approximately 270,000 Victoryland customers had Q-cards between September of 2009 and March of 2010, but a majority of those persons did not use the cards while playing bingo. In fact, two of the class representatives — Palmer and Williams — admitted during deposition that they did not always use their Q-Cards when playing bingo. Additionally, because use of the cards did not require photo identification or a secret PIN number, a person other than the individual to whom a Q-Card was registered could play using that card. Indeed, it was common for Q-Card holders to loan their cards to other players, in order for the card holder to more quickly accumulate points toward bonuses and other perks. A player also might use another player's card if the other player accidentally left the card in the machine after completing a game. Thus, there was no way for Victoryland to ensure that the person using a Q-Card at any given time was the same person to whom the card was registered.

**B**.    **Tracking Players' Wins and Losses**

To track players' wins and losses, Victoryland used a computer software program called the Advantage Tracking System ("ATS"). The only way to tie win/loss data to a particular individual was if that individual used his Q-Card while

playing.  The ATS system generated win/loss reports based on each player's

"session" of play.  A session began when the player inserted his or her Q-Card into

the machine, and it ended when the player removed the Q-Card.  Thus, a session

could consist of a single bingo game, or it could consist of many games.  There is

no evidence that the ATS system was equipped to track wins and losses on a game-

by-game, as opposed to a session-by-session, basis.[2]

---

[2] Plaintiffs rely heavily upon a statement made by Victoryland's corporate representative suggesting that it is possible that the ATS system could produce game-level data.  The entire exchange during the representative's deposition is as follows:

> Q.  Okay.  So, [the report from the ATS system] would have that level of detail [about the player's wins and losses] at least on a session basis?
>
> A.  I'm — I'm not following your question.
>
> Q.  Okay.  The information you just described would exist at least on a session basis?
>
> A.  I don't remember if it's on a session basis or on an itemized play or entry basis.  I just don't recall.
>
> Q.  Okay.  What do you mean by "itemized play basis"?
>
> A.  That every time he purchased cards, it shows that or if it — or if it accumulates it.  I just don't remember.
>
> Q.  So, in other words, kind of a game-by-game basis?
>
> A.  Uh-huh, yes.
>
> Q.  Okay.  *So it's possible that it may even have game-by-game level detail*?
>
> A.  *Yes.  I just — I don't know that.  I don't recall.*

For each session played by each individual, the ATS system generated a report identifying the machine on which the session was played, the beginning and ending time of the session, the total number of seconds the session lasted, and the total number of games played during the session (but not the length of each game, or the amount won or lost during each game). The report also contained financial data, including a column each for Purchases, Prizes, Jackpots, and Wins. The Purchases column indicated the total amount of purchases made on the machine during that session. The Prizes column showed the total amount of winnings the player received during the session. The Jackpot column showed any wins exceeding the amount of $1,200. The "Win" column indicated the amount of the win for the house and the loss for the player — *i.e.,* the sum of all Purchases for the session minus all Prizes for that session.

---

Q. How would you go about finding that out?

A. Look at the table.

Tr. doc. 218-1, at 80-81 (alterations and emphasis supplied). Later in the deposition, counsel for the appellees asked the following question: "Prior to the break, Mr. Russell, we were discussing the amount or type of data that may still be available on Macon County's computer. And you mentioned it should have the session level data at least, if not possibly game level data, correct?" The Victoryland representative responded, "Yes, ma'am." *Id.* at 92. This testimony cannot be fairly construed to mean that there is a reasonable possibility that the ATS system produces game-level data. Rather, the testimony reflects that the representative simply did not recall whether the data was produced on a game-level or session-level basis. He did, however, state that he could find that answer by looking at the reports generated by the ATS system ("tables"), which clearly include only session-level data. Additionally, the corporate representative for

7

The ATS system also generated a report spanning the entire class period that showed:  (1) the name and address of each person who used a Q-Card while playing bingo on one of defendants' machines during the class period; (2) the total amount wagered by each Q-Card user during the class period (while using their Q-Cards); (3) the total amount won by each Q-Card user during the class period (while using their Q-Cards); (4) the net loss to each Q-Card user (*i.e.,* the net gain to the house) during the class period (while using their Q-Cards); and (5) the manufacturer on whose machine the wins or losses were incurred.  There is also a spreadsheet that shows, for each Q-Card user, the total amount lost (*i.e.,* the total amount won by the house) on each defendant's machines (*i.e.,* how much each user lost on Bally machines, IGT machines, and Multimedia machines).

## C.    **Relationship Between Victoryland and the Other Defendants**

The Manufacturers leased their electronic bingo machines to Victoryland.  A corporate representative of IGT described the agreement between IGT and Victoryland as follows:

> The agreement between IGT and VictoryLand provided that VictoryLand would pay IGT a percentage of the net win of each electronic bingo terminal calculated periodically.  If the rent calculated in this manner fell below a threshold amount, IGT would receive a guaranteed minimum rent.  The rent calculation was made

Multimedia testified unequivocally that the company was "not able to determine on a game by game level what the outcome of that game was."  Tr. doc. 218-4, at 20.

8

by subtracting the amount paid out to all winners on a given terminal from the amount wagered by all players on that terminal and if this amount was positive, it would be multiplied by the agreed percentage. If the amount was negative or below a defined dollar amount, VictoryLand would pay a minimum rent.[3]

Victoryland's agreements with the other bingo machine manufacturers were similar. In any event, the amount of the Manufacturers' payments to Victoryland depended upon the aggregated results of *all* activity on each machine over a given time period, usually weekly. The payments did not depend upon any particular player's wins or losses, or on whether the players were using a Q-Card. The rent payments were not connected in any way to data collected about Q-Card use.

## II. STANDARD OF REVIEW

A district court's grant of class certification is reviewed for an abuse of discretion. *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1264 (11th Cir. 2009) (citing *Klay v. Humana, Inc.*, 382 F.3d 1241, 1251 (11th Cir. 2004), *abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008)). "As long as the district court's reasoning stays within the parameters of Rule 23's requirements for certification of a class, the district court decision will not be disturbed." *Hines v. Widnall*, 334 F.3d 1253, 1255 (11th Cir. 2003) (citing *Shroder v. Suburban Coastal Corp.*, 729 F.2d 1371, 1374 (11th Cir. 1984)).

---

[3] Tr. doc. 224-1 ¶ 3.

A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous. A district court may also abuse its discretion by applying the law in an unreasonable or incorrect manner. Finally, an abuse of discretion occurs if the district court imposes some harm, disadvantage, or restriction upon someone that is unnecessarily broad or does not result in any offsetting gain to anyone else or society at large. In making these assessments, we review the district court's factual determinations for clear error, and its purely legal determinations *de novo*.

*Vega,* 564 F.3d at 1264-65 (quoting *Klay*, 382 F.3d at 1251).

### III. DISCUSSION

A plaintiff seeking class certification bears the burden of satisfying all implicit and explicit requirements of Federal Rule of Civil Procedure 23. *Id.* at 1267; *see also Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181, 1187-88 (11th Cir. 2003) (holding that the burden of proof to establish the propriety of class certification rests with the advocate of the class, and the district court has an independent obligation to evaluate whether the requirements of Rule 23 have been met).

One threshold requirement is not mentioned in Rule 23, but is implicit in the analysis: that is, the plaintiff must demonstrate that the proposed class is "'adequately defined and clearly ascertainable.'" *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012) (quoting *DeBremaecker v. Short*, 433 F.2d 733,

734 (5th Cir. 1970)).[4]  The trial court's discussion of the "adequately defined and

clearly ascertainable" requirement was clear, concise, and supported by applicable

law, and it will be reiterated here:

> "An identifiable class exists if its members can be ascertained by reference to objective criteria." *Fogarazzo v. Lehman Bros., Inc.*, 263 F.R.D. 90, 97 (S.D. N.Y. 2009).  The analysis of the objective criteria also should be administratively feasible.  "Administrative feasibility" means "that identifying class members is a manageable process that does not require much, if any, individual inquiry." *Newberg on Class Actions* § 3.3 p. 164 (5th ed. 2012).  Where a plaintiff satisfies this threshold issue, the district court then "conducts a rigorous analysis of the [R]ule 23 prerequisites." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1266 (11th Cir. 2009) (citation and internal quotation marks omitted).[5]

> Additionally, the explicit language of Rule 23 requires proof that:

> > (1)  the [putative] class is so numerous that joinder of all class members is impracticable;

> > (2)  there are questions of law or fact common to the class;

> > (3)  the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

> > (4)  the representative parties will fairly and adequately protect the interests of the class.

---

[4] The Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981 in *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

[5] Tr. doc. 241, at 5 (alteration in district court's opinion).

11

Fed. R. Civ. P. 23(a) (alteration supplied).  These requirements are commonly referred to as numerosity, commonality, typicality, and adequacy.

In addition to satisfying all of the requirements of Rule 23(a), a party seeking class certification must show that the action is maintainable under at least one of the three sub-sections of Rule 23(b).  Here, appellees sought certification under Rule 23(b)(3).  Therefore, they were required to show "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

We find that the district court abused its discretion in concluding that the proposed class was adequately defined and clearly ascertainable, and that issues common to all class members would predominate over issues affecting only individual members.

A.    **Ascertainability**

The district court found that the objective criteria for identifying members of the defined class could "be analyzed in a manageable and administratively feasible way, namely, by reference to Victoryland's records."[6]  We agree that the reports

---

[6] *Id.* at 7.

generated by defendants' ATS system provide sufficient data to identify all

individuals who, while using their Q-Club cards, suffered net losses *at the session

level*.  The problem is that the district court's class definition is not restricted to

individuals who suffered session-level losses.  As currently defined, the class also

could encompass individuals who suffered losses at the game level, but not at the

session level.  Appellees have not provided *any* indication that they have, or even

that they can obtain, data about losses at the game level.  Accordingly, the class

definition must be revised to include only those players who, while using their Q-

Club cards, suffered *net* losses at the *session* level.

## B.    Predominance

> A class may be certified only if "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  "Under the Rule 23(a)(2) commonality requirement, a class action must involve issues that are susceptible to class-wide proof."  *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001).  Commonality requires "that there be at least one issue whose resolution will affect all or a significant number of the putative class members."  *Stewart v. Winter*, 669 F.2d 328, 335 (5th Cir. 1982) (footnote omitted).

*Williams v. Mohawk Industries, Inc.,* 568 F.3d 1350, 1355 (11th Cir. 2009).  The

Supreme Court has emphasized that, "for purposes of Rule 23(a)(2) "'[e]ven a

single [common] question'" will do . . . ."  *Wal-Mart Stores, Inc. v. Dukes*, – U.S. –

, 131 S. Ct. 2541, 2556 (2011) (alterations in original).

The same analytical principles govern Rule 23(b).  If anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a).  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623-624, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997).  Rule 23(b)(3), as an "'adventuresome innovation,'" is designed for situations "'in which "class-action treatment is not as clearly called for."'"  *Wal-Mart, supra*, at – , 131 S. Ct., at 2558 (quoting *Amchem*, 521 U.S., at 614-615, 117 S. Ct. 2231).  That explains Congress's addition of procedural safeguards for (b)(3) class members beyond those provided for (b)(1) or (b)(2) class members (*e.g.*, an opportunity to opt out), and the court's duty to take a "'close look'" at whether common questions predominate over individual ones.  *Id.*, at 615, 117 S. Ct. 2231.

*Comcast Corp. v. Behrend*, – U.S. – , 133 S. Ct. 1426, 1432 (2013).  Additionally,

[t]o obtain Rule 23(b)(3) class certification "the issues in the class action that are subject to generalized proof and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof."  *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1557-58 (11th Cir. 1989) (quotations and citation omitted).  "Common issues of fact and law predominate if they 'ha[ve] a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief.'"  *Klay*, 382 F.3d at 1255 (quoting *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 699 (N.D. Ga. 2001)).  On the other hand, common issues will not predominate over individual questions if, "as a practical matter, the resolution of [an] overarching common issue breaks down into an unmanageable variety of individual legal and factual issues."  *Andrews v. Am. Tel. & Tel. Co.,* 95 F.3d 1014, 1023 (11th Cir. 1996).  Certification is inappropriate if the "plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims."  *Klay*, 382 F.3d at 1255 (citing *Perez v. Metabolife Int'l, Inc*., 218 F.R.D. 262, 273 (S.D. Fla. 2003)).  The predominance inquiry requires an examination of "'the claims, defenses, relevant facts, and applicable substantive law,' . . . to assess the degree to which resolution of the classwide issues will further each individual class

14

member's claim against the defendant." *Id*. at 1254 (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996)).

*Babineau v. Federal Express Corp.*, 576 F.3d 1183, 1191 (11th Cir. 2009) (first alteration supplied, other alterations in original).

The Manufacturers challenged the district court's finding of predominance only insofar as it concerned damages. The district court found:

> Plaintiffs also must prove that they lost money and the amount of those losses. Admittedly, the damages calculations will involve some individualized inquiries, as Defendants devote much ink to pointing out, but not to the extent that those inquiries predominate over the common questions with respect to liability. Generally, "the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate." *Allapattah Servs.*, 333 F.3d at 1261 (collecting cases); *see also Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs.*, 601 F.3d 1159, 1178 (11th Cir. 2010) ("The presence of individualized damages issues does not prevent" certification of a Rule 23(b)(3) class.). Here, the Q-Club card data stored in the IGT Advantage System will reduce the number of individual factual inquiries to a significant degree . . . . Although Defendants highlight the shortcomings of the data, those shortcomings present issues for sifting at the merits stage, not the class certification stage.[7]

That finding was an abuse of discretion, in light of the Supreme Court's decision in *Comcast Corp. v. Behrend*, – U.S. – , 133 S. Ct. 1426 (2013), which was handed down on March 27, 2013 — only two days before the district court's opinion, and long after the parties had briefed the class certification issue to the

---

[7] *Id.* at 18 (internal citation omitted).

district court.  In *Comcast*, the Supreme Court reiterated that class certification is an *evidentiary* question, not just an analysis of the pleadings.

> Repeatedly, we have emphasized that it "'may be necessary for the court to probe behind the pleadings before coming to rest on the certification question,' and that certification is proper only if 'the trial court is satisfied, *after a rigorous analysis*, that the prerequisites of Rule 23(a) have been satisfied.'"  [*Wal-Mart Stores,* 131 S. Ct. at 2551] (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160-161, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)).  *Such an analysis will frequently entail "overlap with the merits of the plaintiff's underlying claim."* 564 U.S., at –, 131 S. Ct., at 2551.  That is so because the "'class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Ibid.* (quoting *Falcon, supra*, at 160, 102 S. Ct. 2364).

*Comcast*, 133 S. Ct. at 1432 (alteration and emphasis supplied).

The district court acknowledged the *Comcast* decision, but it nonetheless failed to conduct the "rigorous analysis" required by that decision — instead deferring resolution of important questions bearing on the class certification analysis to the merits stage of the case.  That failure cannot be overlooked, because the "shortcomings in the data" are significant and bear directly on the issue of predominance.  As discussed above, appellees did not identify, either in their briefs or at oral argument, any method for quantifying their losses at the game level, as opposed to the session level, even though recovery of game-level losses is what they have requested in this case.  They also have not identified any definite method

16

for allocating their damages among the Manufacturers and Victoryland.  In other words, for each dollar lost by a class member on a machine owned by Bally, for example, appellees have offered no method for determining how many cents were pocketed by Victoryland, and how many were pocketed by Bally.  The money was collected in the first instance by Victoryland, and then distributed among the Manufacturers according to their respective leases with Victoryland.  The amount due under the lease was calculated based on the net player loss, by all players, on each machine, over a certain period of time, usually weekly.  It remains unclear, therefore, how the district court would ever be able to allocate liability and damages among the various defendants.  *See id*. at 1433 (concluding that plaintiffs' expert's model for damages "falls far short of establishing that damages are capable of measurement on a classwide basis," and finding that "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class").

## IV.  CONCLUSION

For the foregoing reasons, we conclude that the district court abused its discretion in certifying the plaintiff class.  The district court's order certifying a class is therefore reversed, and the case is remanded for the district court to modify the class definition to include:  "All persons who, at any time during the period

beginning September 4, 2009 through and including February 1, 2010, while using their Q-Club cards, suffered a net loss of money or value playing electronic 'bingo,' as shown by session-level data obtained from defendants' Advantage Tracking System (ATS) computers at the Macon County Greyhound Park, commonly known as Victoryland."  The district court is further directed, on remand, to conduct the "rigorous analysis" required by the Supreme Court's *Comcast* decision regarding whether calculation of the class members' damages would necessitate such individual inquiry that individual issues would predominate over common ones.[8]

**REVERSED AND REMANDED**.

---

[8] To the extent necessary, the district court may wish to allow some discovery on the damages issue.  In any event, supplemental briefing on the damages issue appears required because plaintiffs must show a model establishing that "damages are capable of measurement on a classwide basis."  *Comcast*, 569 U.S. at —, 133 S. Ct. at 1433.