Sebastian CORDOBA, individually and on behalf of all others similarly situated, Plaintiff,

v.

DIRECTV, LLC, individually and as successor through merger to DirecTV, Inc., Defendant.

CIVIL ACTION FILE NO. 1:15–CV–3755–MHC

United States District Court, N.D. Georgia, Atlanta Division.

Signed 07/12/2017

Daniel M. Hutchinson, Douglas I. Cuthbertson, Pro Hac Vice, Lieff Cabraser Heimann & Bernstein, San Francisco, CA, Douglas I. Cuthbertson, Jonathan D. Selbin, Pro Hac Vice, Lieff Cabraser Heimann & Bernstein, New York, NY, G. Taylor Wilson, Jonathan David Grunberg, L. Lin Wood, Jr., Nicole Jennings Wade, L. Lin Wood, P.C., Atlanta, GA, Matthew Michael Wilkins, Stephen Andrew Yaklin, King Yaklin & Wilkins, LLP, Marietta, GA, Matthew R. Wilson, David P. Meyer & Associates Co., LPA, Michael Joseph Boyle, Jr., Meyer Wilson Co., LPA, Columbus, OH, for Plaintiff.

Hans J. Germann, Pro Hac Vice, John Muench, Kyle J. Steinmetz, Mayer Brown LLP, Chicago, IL, Ava Conger, John P. Jett, Kilpatrick Townsend & Stockton, LLP, Kara Whei-juan Ong, Atlanta, GA, for Defendant.

## ORDER

MARK H. COHEN, United States District Judge

This case comes before the Court on Plaintiff Sebastian Cordoba ("Plaintiff")'s Motion for Class Certification [Doc. 63], Defendant DIRECTV, LLC ("DIRECTV")'s Motion for Leave to Amend its Answer [Doc. 82] ("Def.'s Mot. for Leave to Amend"), and Plaintiff's Objection to the Expert Report of Dr. Debra J. Aron [Doc. 74] ("Pl.'s Obj. to Expert").

## I. BACKGROUND

This action involves a proposed class action lawsuit against Defendant DIRECTV for violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, and related rules and regulations promulgated by the Federal Communication Commission, 47 C.F.R. § 64.1200 (the "FCC Regulations"). Second Am. Compl. [Doc. 61] ¶ 2. In his Motion for Class Certification, Plaintiff Sebastian Cordoba seeks to certify two classes of individuals who received unwanted telephone calls made on behalf of DIRECTV for

the purpose of selling or encouraging the sale of DIRECTV's goods and/or services.

Congress enacted the TCPA in 1991 "to protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the home and to facilitate interstate commerce by restricting certain uses of . . . automatic dialers." Ashland Hosp. Corp. v. Serv. Emp. Int'l Union, Dist. 1199 WV/KY/OH, 708 F.3d 737, 740 (6th Cir. 2013) (quoting S. Rep. No. 102–178, at 1 (1991), reprinted in 1991 U.S.C.C.A.N. 1968, 1968). The TCPA authorizes the Federal Communications Commission to regulate telemarketing activities and prohibits sellers from making phone solicitations to people who list their phone numbers on a national do-not-call list ("NDNC" list) without consent. See 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2) (making it unlawful to "initiate any telephone solicitation to . . . a residential telephone subscriber who has registered his or her telephone number on the national-do-not-call registry[.]"). The TCPA also requires that sellers and telemarketers maintain an "internal do-not-call list" ("IDNC" list)—i.e., a "list of persons who request not to receive telemarketing calls made by or on behalf of that [seller]"—and further prohibits sellers from "initiat[ing] any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls by or on behalf of that person or entity[.]" 47 C.F.R. §§ 64.1200(d).[1]

If these procedures are not implemented, each call made by a telemarketer constitutes a violation of the TCPA and the FCC regulations. See 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(d). Under the TCPA, any person who receives two or more such calls has a private right of action to enjoin such violation and to recover the greater of the actual monetary loss, or $500 in damages for such violation. See 47 U.S.C. § 227(c)(5). However, these rules apply only to residential telephone numbers, and calls to businesses are not actionable. See 47 C.F.R. §§ 64.1200(c)(2), (d)(3). Calls are also not actionable if a seller has an "established business relationship" ("EBR") with a customer, which arises for a certain number of months where a residential subscriber makes a purchase, inquiry, or application regarding products or services. See 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(c)(2), (f)(5).[2] Furthermore, "the Federal Communications Commission has ruled that, under federal common-law principles of agency, there is vicarious liability for TCPA violations." Campbell–Ewald Co. v. Gomez, ___ U.S. ___, 136 S.Ct. 663, 674, 193 L.Ed.2d 571 (2016) (citing In re Joint Petition Filed by Dish Network, LLC, 28 FCC Rcd. 6574 (2013)).

### A. Plaintiff's Motion for Class Certification

According to the allegations in the Second Amended Complaint, DIRECTV engaged Telecel Marketing Solutions, Inc. ("Telecel")—which operates call centers in El Salvador and Maryland—to market its products and services by telephone beginning in or around 2003. Second Am. Compl. ¶¶ 4, 25; Dep. of Fredy Diaz taken Sept. 21, 2016 [Doc. 64–1] ("Diaz Dep.") at 76. Between

---

1. Specifically, the FCC regulations mandate that all telemarketers institute certain minimum procedures and standards prior to placing any telemarketing call, pursuant to which they must:

 Maintain a written policy, available upon demand, for maintaining an internal do-not-call list;

 Train personnel engaged in any aspect of telemarketing regarding the existence and use internal do not call list;

 Record requests not to be called;

 Provide called parties with the name of the individual caller, the name of the person or identity on whose behalf the call is made, and a telephone number or address at which the person or entity may be contacted; and

 Maintain a list of persons who request not to receive telemarketing calls that must be honored for five years from the time individual requests are made.

 Id. §§ 64.1200(d)(1)-(6).

2. There is an exception to this rule: the FCC regulations provide that a subscriber's "seller-specific do-not-call request"—that is, a subscriber's request that it be placed on a seller's IDNC list—"terminates an established business relationship for purposes of telemarketing and telephone solicitation even if the subscriber continues to do business with the seller." 47 C.F.R. § 64.1200(f)(5)(i).

March 27, 2015, and March 3, 2016, Telecel placed at least 60,506 calls to 24,566 unique telephone numbers for the purpose of selling or encouraging the sale of DIRECTV products or services, pursuant to a contract between Telecel and DIRECTV. Second Am. Compl. ¶ 43.

Plaintiff alleges that, at all times relevant to this lawsuit, Telecel did not institute the mandatory minimum procedures required by 47 C.F.R. §§ 64.1200(d)—specifically, that Telecel (1) did not keep an internal do-not-call list; (2) did not maintain a written policy for maintaining an internal do-not-call list; (3) did not train its employees with respect to the existence of, or adherence to, an internal do-not-call list; (4) did not record requests not to be called; and (5) neither adhered to requests not to be called nor "scrubbed" these requests against a list of persons who requested not to be called prior to initiating contact with consumers. Id. ¶¶ 44–49; Diaz Dep. at 106; see 47 C.F.R. § 64.1200(d)(1)-(6).[3] Accordingly, Plaintiff alleges that, between March 27, 2015, and March 3, 2016, Telecel: (1) initiated a total of at least 2,829 telephone calls for the purpose of marketing DIRECTV's goods and/or services to Plaintiff and 925 others who received more than one such call while on the National Do Not Call Registry; and (2) initiated at least 52,-810 telephone calls to Plaintiff and 16,869 others who received more than one such call without instituting the mandatory minimum procedures required by 47 C.F.R. § 64.1200(d). Second Am. Compl. ¶¶ 53–54.

### B. Allegations Specific to Plaintiff Sebastian Cordoba

Plaintiff Sebastian Cordoba alleges that he began receiving unsolicited telemarketing calls from DIRECTV in July 2014, approximately one month after DIRECTV was made expressly aware of Telecel's cold-calling practices, and that he has received more than one call per twelve-month period from DIRECTV and Telecel since December 12, 2014—including eighteen calls between April 6, 2015, and November 4, 2015. Id. ¶¶ 59–61. Plaintiff has been on the NDNC Registry since December 2014, has repeatedly requested—both verbally and in writing—that both companies refrain from calling him, and in fact received a written response from DIRECTV, on or about January 9, 2015, stating that its calls would cease. Id. ¶¶ 59, 62–65. Nevertheless, Plaintiff alleges that he continued to receive

---

**3.** DIRECTV is no stranger to TCPA litigation: since 2005, it has been sued twice by the United States Department of Justice for violations of the TCPA and FCC regulations for marketing its programming through telemarketers who placed calls to consumers on the National Do Not Call Registry. See United States v. DIRECTV, Inc., No. 05–1211 (C.D. Cal. Dec. 12, 2005) ("2005 lawsuit"); United States v. DIRECTV, Inc., No. 09–02605 (C.D. Cal. April 16, 2009) ("2009 lawsuit").

In resolving the 2005 lawsuit, DIRECTV entered into a stipulated judgment pursuant to which it agreed, inter alia, to pay a civil penalty of $5,335,000 and consented to "myriad injunctions requiring compliance with the Telemarketing Sales Rule [16 C.F.R. § 310 et seq.]." Second Am. Compl. ¶¶ 27–30. In resolving the 2009 lawsuit (which involved substantially similar allegations), DIRECTV again agreed to a stipulated judgment pursuant to which it paid a civil penalty of $2,310,000. Id. ¶¶ 32–34. DIRECTV also consented to a permanent injunction pursuant to which it was: (1) permanently restrained from placing calls to persons who requested not to receive calls by on behalf of DIRECTV; (2) permanently restrained from placing calls to persons whose telephone numbers are on the National Do Not Call Registry; (3) required to

conduct a reasonable due diligence investigation prior to engaging a telemarketer to ensure that such person or entity has established and actively enforces effective policies and procedures for compliance with the TCPA's restrictions on calls to persons who request not to be called and calls to persons whose numbers are on the National Do Not Call Registry; (4) required to monitor all outbound telemarketing campaigns to determine whether calls are being placed to numbers on the National Do Not Call Registry or to persons who request not to be called; (5) required to monitor its authorized marketers to determine whether they are conducting telemarketing campaigns; (6) required to promptly investigate each consumer complaint and take all reasonable steps to identify the marketer whose activities prompted the complaint; (7) obligated to cease doing business with any telemarketer or marketer that it knows or should know is making calls to persons who have requested not to be called or to persons whose numbers are registered on the National Do Not Call Registry; and (8) prohibited from providing any assistance or support to any telemarketer it knows or consciously avoids knowing is engaged in TCPA violations. Id. ¶ 35. Plaintiff alleges that DIRECTV has failed to perform any of these obligations. Id. ¶¶ 36.

unsolicited calls from Telecel on DIRECTV's behalf "from spring to fall 2015." Id. ¶ 66.

### C. Allegations Specific to Plaintiff's Proposed Classes

Based on the above allegations, Plaintiff proposes two representative classes: the Internal Do Not Call ("IDNC") Class [4] and the National Do Not Call ("NDNC") Class. Id. ¶ 67. The Second Amended Complaint proposes the following definitions for the IDNC and NDNC Classes:

> **IDNC Class:** All persons within the United States who received more than one telephone call on or after October 27, 2011, from Telecel on behalf of DIRECTV for the purpose of selling or encouraging the sale of DIRECTV's goods and/or services.
>
> **NDNC Class:** All persons residing within the United States whose telephone numbers were on the National Do Not Call Registry, but who received more than one telephone call on or after October 27, 2011, from Telecel on behalf of DIRECTV for the purpose of selling or attempting to sell DIRECTV's goods and/or services.

Id. ¶¶ 68, 71.

As explained above, the proposed IDNC Class consists of 16,870 individuals who received a total of 52,810 calls; the proposed NDNC Class consists of 926 individuals who received a total of 2,829 calls. Plaintiff seeks both statutory damages and treble statutory damages for each of DIRECTV's alleged violations of the TCPA and FCC regulations, as well as injunctive relief.

## II. LEGAL STANDARD

■ "Before a district court may grant a motion for class certification, a plaintiff seeking to represent a proposed class must establish that the proposed class is 'adequately defined and clearly ascertainable.'" Little v. T-Mobile USA, Inc., 691 F.3d 1302, 1304 (11th Cir. 2012) (quoting DeBremaecker v. Short, 433 F.2d 733, 734 (5th Cir. 1970))[5].

■ If the plaintiff's proposed class is adequately defined and clearly ascertainable, the plaintiff must then meet the requirements listed in Federal Rule of Civil Procedure 23. "A class action may be maintained only when it satisfies all the requirements of Federal Rule of Civil Procedure 23(a) and at least one of the alternative requirements of Rule 23(b)." Jackson v. Motel 6 Multipurpose, Inc., 130 F.3d 999, 1005 (11th Cir. 1997) (footnotes omitted). Rule 23(a) requires Plaintiffs to show that:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a). "Those four requirements commonly are referred to as the prerequisites of numerosity, commonality, typicality, and adequacy of representation, and they are designed to limit class claims to those fairly encompassed by the named plaintiffs' individual claims." Piazza v. Ebsco Indus., Inc., 273 F.3d 1341, 1346 (11th Cir. 2001) (internal punctuation omitted).

■ If Rule 23(a) is satisfied, Rule 23(b) further provides that a class action may be maintained only where one of the three following requirements is met:

(1) prosecuting separate actions by or against individual members of the class would create a risk of prejudice to the party opposing the class or to those members of the class not parties to the subject litigation, see FED. R. CIV. P. 23(b)(1);

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that

---

4. The parties occasionally refer to the IDNC Class as the "Minimum Procedures Violation Class" (or "MPVC Class") in their pleadings. The Court will use the former acronym in this Order.

5. In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued before October 1, 1981.

final injunctive or declaratory relief is appropriate respecting the class as a whole, see FED. R. CIV. P. 23(b)(2); or

(3) questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy, see FED. R.CIV.P. 23(b)(3).

The party seeking class certification bears the burden of showing that these requirements are met. Valley Drug Co. v. Geneva Pharm., Inc., 350 F.3d 1181, 1187 (11th Cir. 2003).

 "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage," and the merits of a suit may be considered "only to the extent" they pertain to the Rule 23 analysis. Amgen Inc. v. Conn. Retirement Plans & Tr. Funds, 568 U.S. 455, 133 S.Ct. 1184, 1194–95, 185 L.Ed.2d 308 (2013). Nevertheless, courts must perform a "rigorous analysis" to ensure that Rule 23's requirements are satisfied before certifying a class, Gen. Tel. Co. v. Falcon, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), even where some of the requirements are not in dispute, Valley Drug Co. v. Geneva Pharm., Inc., 350 F.3d 1181, 1188 (11th Cir. 2003), or where the Court must decide disputed questions of fact that bear on the inquiry, Brown v. Electrolux Home Prods., Inc., 817 F.3d 1225, 1233–34 (11th Cir. 2016). See also Wal–Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011) ("Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.") (emphasis in original); In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 307 (3d Cir. 2008) ("Factual determinations supporting Rule 23 findings must be made by a preponderance of the evidence."). This "rigorous analysis" frequently "entail[s] some overlap with the merits of the plaintiff's underlying claim." M. H. v. Berry, No. 1:15-CV-1427-TWT, 2017 WL 2570262, at *3 (N.D. Ga. June 14, 2017) (citing Dukes, 564 U.S. at 351–52, 131 S.Ct. 2541).

## III. DISCUSSION

### A. DIRECTV's Motion for Leave to Amend and Plaintiff's Objection to the Expert Report of Dr. Debra J. Aron

Before reaching the merits of Plaintiff's Motion for Class Certification, the Court must first address two other pending motions: DIRECTV's Motion for Leave to Amend its Answer, and Plaintiff's Objection to the Expert Report of Dr. Debra J. Aron. Because the facts and arguments related to these motions are intertwined, the Court will consider them together.

#### 1. Relevant Procedural History

DIRECTV filed its opposition to Plaintiff's Motion for Class Certification on December 12, 2016, approximately two months after filing its Answer [Doc. 62] to Plaintiff's Second Amended Complaint. As discussed in more detail below, DIRECTV argues in its opposition that this Court should refuse to certify Plaintiff's proposed classes because, *inter alia*, many of the individuals who received calls advertising DIRECTV's services already had an "established business relationship" with the company—i.e., customer agreements pursuant to which they already expressly consented to receive calls from and/or arbitrate disputes with DIRECTV. See Def.'s Opp'n to Pl.'s Mot. for Class Certification [Doc. 70] ("Def.'s Opp'n") at 16–17. In support of its opposition, DIRECTV also submitted the expert report of Dr. Debra J. Aron, a consultant and economist, in which Aron performed a "matching" analysis designed to estimate (among other things) the number of DIRECTV customers included in Plaintiff's proposed classes. See id. at 16–17, 22–23; Expert Report of Debra J. Aron [Doc. 70–9] ("Aron Report") ¶¶ 21–24, 43–57.

Plaintiff's proposed classes are based on an excel spreadsheet of 60,506 outbound telephone calls (the "Telecel Call Data") that Plaintiff alleges Telecel placed on behalf of DIRECTV between March 27, 2015, and March 3, 2016. In order to estimate the

number of members in Plaintiff's proposed classes, Plaintiff's expert analyzed the Telecel Call Data to determine (a) how many of these telephone numbers received two or more calls (the IDNC class) and (b) how many of these numbers received two or more calls while registered on the NDNC list (the NDNC class). See Decl. of Daniel M. Hutchinson [Doc. 63–1] ("Hutchinson Decl.") ¶ 10; Telecel's Records Custodian's Aff. ("Telecel Aff."), attached as Ex. C. to Hutchinson Decl.; Aff. of Anya Verkhovskaya [Doc. 62–2] ("Verkhovskaya Aff.") ¶¶ 11–13. In preparing her own report, Aron received (and relied upon) a data file created by DIRECTV containing matches between the unique telephone numbers in the Telecel Call Data and telephone numbers associated with customer accounts in DIRECTV's internal customer account database (the "Matched Accounts List"). Aron Report ¶ 24. According to Aron, the Matched Accounts List "includes the name and phone number from the Telecel Call Data and information from DIRECTV's database for account number, first name, last name, create date, activate date, disconnect date, account status, home number, and business number." Id. ¶ 24, 43–57.

On December 16, 2016, two days after DIRECTV filed its opposition, Plaintiff requested a copy of the Matched Accounts List. See Pl.'s Obj. to Expert at 2. But after some discussion between the parties, DIRECTV refused to provide the list pursuant to 47 U.S.C. § 338(i)(4)(A), which prohibits a satellite carrier from disclosing "personally identifiable information concerning any subscriber without the prior written or electronic consent of the subscriber concerned" and mandates that a carrier "shall take such actions as are necessary to prevent unauthorized access to such information by a person other than the subscriber or satellite carrier."

In response to DIRECTV's refusal, Plaintiff filed its Objection to the Expert Report of Dr. Debra J. Aron ("Objection"), arguing, *inter alia*, that (1) DIRECTV has misconstrued the requirements of 47 U.S.C. § 338(i)(4)(A); (2) DIRECTV's failure to disclose the Matched Accounts List constitutes a violation of Federal Rule of Civil Procedure 26(a)'s disclosure requirements, thus warranting the exclusion of those portions of Aron's report and testimony reliant on the Matched Accounts List; and (3) by failing to plead its EBR defense as an affirmative defense in its Answer to the Complaint, DIRECTV has waived it. See Pl's Obj. to Expert at 4–8. Although DIRECTV disputes each of these claims, it has now also moved, in an abundance of caution, to amend its answer pursuant to Federal Rule 15(a) to include an affirmative EBR defense. See Def.'s Mot. for Leave to Amend. Plaintiff has opposed DIRECTV's motion to amend, arguing that, without access to the evidence (i.e., the Matched Accounts List) supporting this defense, it would have no ability to test its validity. See Pl.'s Opp'n to Def.'s Mot. for Leave to Amend its Answer [Doc. 86] ("Pl.'s Opp'n to Def.'s Mot. to Amend") at 15–16.

### 2. Analysis

At the outset, the Court agrees with Plaintiff that DIRECTV's proposed EBR defense is an affirmative defense for which it bears the burden of proof. See, e.g., Krakauer v. Dish Network L.L.C., 311 F.R.D. 384, 397 (M.D.N.C. 2015) ("EBR is a defense for [defendant] to prove, and the absence of an EBR is not an element of a TCPA claim that [plaintiff] has to prove."); United States v. Dish Network, L.L.C., 75 F.Supp.3d 942, 1008 (C.D. Ill. 2014), vacated in part on other grounds sub nom. United States v. Dish Network, L.L.C., 80 F.Supp.3d 917 (C.D. Ill. 2015) (explaining that an EBR defense is "treated as an affirmative defense for which [defendant] bears the burden of proof."); Elkins v. Medco Health Sols., Inc., No. 4:12CV2141 TIA, 2014 WL 1663406, at *8 (E.D. Mo. Apr. 25, 2014) ("This Court has recognized that a potential recipient's existing business relationship with the defendant is an affirmative defense to the TCPA, and the burden of demonstrating that a call was not unsolicited by way of an existing business relationship or another means, rests with the caller."). Indeed, as Plaintiff points out, DIRECTV pled an affirmative EBR defense in another, recent TCPA case filed in this district. See Answer [Doc. 26] ¶ 82, Holcombe v. DIRECTV LLC, No. 4:14–CV–154–LMM (N.D. Ga. April 28, 2017) (asserting as fourth affirmative defense that plaintiff's claims were barred because he "had an established business relationship with DIRECTV.").

Nevertheless, though DIRECTV's legal arguments on this point may be less than persuasive, the Court declines (despite Plaintiff's request to the contrary)[6] to attribute DIRECTV's failure to affirmatively plead its EBR defense to bad faith.

■■■■ This leaves the Court with two intertwined decisions: first, whether to permit DIRECTV to amend its answer; and second, whether to exclude Dr. Aron's report. Under Federal Rule of Civil Procedure Rule 15(a), a party may amend his complaint once as a matter of course within twenty-one days after service of a response by answer or motion. Otherwise, the party may amend his pleading "only with the opposing party's written consent or the court's leave." FED. R. CIV. P. 15(a)(2). Rule 15(a) further instructs that "[t]he court should freely give leave when justice so requires." Id. "[U]nless there is a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial." Thomas v. Town of Davie, 847 F.2d 771, 773 (11th Cir. 1988) (quoting Dussouy v. Gulf Coast Inv. Corp., 660 F.2d 594, 598 (5th Cir. 1981)); see also Spanish Broad. Sys. v. Clear Channel Comm'ns, 376 F.3d 1065, 1077 (11th Cir. 2004) ("The Supreme Court has emphasized that leave to amend must be granted absent a specific, significant reason for denial.") (citing Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). Nevertheless, courts may deny a motion to amend for many reasons, including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment..." Foman, 371 U.S. at 182, 83 S.Ct. 227; see also Carruthers v. BSA Adver., Inc., 357 F.3d 1213, 1218 (11th Cir. 2004).

Plaintiff represents that, although he previously agreed to consent to an amended answer "if DIRECTV would provide discovery necessary to evaluate the validity of the purported EBR defense, including the Matched Accounts List and a signed contract for each person for whom DIRECTV maintains that an EBR defense applies," DIRECTV rejected this offer. Pl.'s Opp'n to Def.'s Mot. to Amend at 7–8. In response, DIRECTV maintains that it withheld the Matched Accounts List from Plaintiff because (as it represented to Plaintiff's counsel) it believed it could not produce the customer data underlying the matching analysis without a court order. See 47 U.S.C. § 338(i)(4)(B)(ii) (permitting a satellite carrier to disclose personally identifiable information concerning subscribers pursuant to a court order authorizing such disclosure)[7]; Def.'s Opp'n to Pl.'s Objs. to the Aron Report [Doc. 79] ("Def.'s Opp'n to Pl.'s Objs.") at 9–10. Believing DIRECTV's invocation of 47 U.S.C. § 338(i)(4)(A)'s disclosure provision improper, Plaintiff has yet to seek such an order from the Court.

The parties argue at length about whether DIRECTV has properly invoked 47 U.S.C. § 338(i)(4)(A) as a bar to withholding the Matched Accounts List, or whether, alternatively, the failure to provide this information to Plaintiff ran afoul of Federal Rule of Civil Procedure 26's requirement that DIRECTV disclose the "facts or data" Dr. Aron considered in preparing her report. See FED. R. CIV. P. 26(a)(2)(B)(ii). The Court agrees with DIRECTV that, at a minimum, the Matched Accounts List's inclusion of various forms of customer data (including individuals' status as DIRECTV customers, account numbers, and creation and disconnect dates), see Def.'s Opp'n to Pl.'s Objs. at 8–9, brings it within the "consent to disclosure" provisions of 47 U.S.C. § 338(i)(4)(A)—and that DIRECTV's failure to disclose this information to Plaintiff in the absence of a court order was substantially justified. See FED. R. CIV. P. 37 ("If a

---

6. Plaintiff argues at some length that DIRECTV has acted in bad faith by raising its EBR defense for the first time in its opposition to Plaintiff's Motion for Class Certification, rather than in its answer. See Pl.'s Opp'n to Def.'s Mot. to Amend at 9–13. However, although DIRECTV's claim that it was not required to affirmatively plead its EBR defense may strain credulity, see Def.'s Reply in Supp. of its Mot. for Leave to Amend its

Answer [Doc. 90] at 10–12, the Court finds DIRECTV's legal arguments plausible enough to support the contention that they were brought in good faith.

7. The same provision also requires that the party to whom such an order is directed notify each affected subscriber. Id.

party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.").[8] Nevertheless, the Court finds that Plaintiff would face substantial prejudice if he was forced to respond to DIRECTV's proposed EBR defense without access to the data on which this defense appears to rest; indeed, as Plaintiff stresses, see Pl.'s Obj. to Expert at 4, his expert would be unable to provide any opinion about the Matched Accounts List without access to the data on which it is based. See Reed v. Binder, 165 F.R.D. 424, 430 (D.N.J. 1996) ("Nothing causes greater prejudice than to have to guess how and why an adversarial expert reached his or her conclusion.").

It appears there is a straightforward solution to this problem. DIRECTV gives no indication in its briefing that it would oppose a court order pursuant to 47 U.S.C. § 338(i)(4)(B)(ii) directing it to disclose the data underlying the Matched Accounts List. Furthermore, although Plaintiff now seeks to bar DIRECTV from asserting an EBR defense altogether (as well as exclude much of Dr. Aron's testimony), the Court is reluctant to employ such a severe sanction at this relatively early stage in the case—particularly in light of the fact that, shortly before filing the present motions, Plaintiff proposed that he would consent to an amended answer if DIRECTV would provide discovery necessary to evaluate the validity of its proposed EBR defense, including (1) the Matched Accounts List, and (2) a signed contract for each person for whom DIRECTV maintains that an EBR defense applies.[9]

Accordingly, Defendant DIRECTV, LLC's Motion for Leave to Amend its Answer [Doc. 82] is **GRANTED.** However, the Court **ORDERS** DIRECTV to disclose the Matched Accounts List to Plaintiff pursuant to the procedures set forth in U.S.C. § 338(i)(4)(B)(ii). Once Plaintiff has received that list, the Court further **ORDERS** that discovery be reopened for a period of time not to exceed 30 days for the limited purpose of allowing Plaintiff to explore DIRECTV's EBR defense.[10] The parties are **DIRECTED** to attempt to reach an agreement concerning these issues, and to submit a joint stipulation and proposed order to effectuate this process.

## B. Plaintiff's Motion for Class Certification

### 1. Threshold Issues Affecting Class Certification

#### a. Whether the Proposed IDNC Class Lacks Standing

■ Before reaching the question of whether the proposed classes meet the re-

---

8. Whether DIRECTV has invoked this defense in good faith is a separate (and more ambiguous) question: as Plaintiff points out, it appears that DIRECTV's disclosure of the Matched Account List to Dr. Aron, a non-party to this litigation, did not fall within any of the exceptions permitting disclosure of data, see 47 U.S.C. § 338(i)(4)(B)(i)-(iv), thus calling into question the truthfulness of its representations to this Court. See Pl.'s Reply in Supp. of Obj. to Expert Report [Doc. 84] at 6–8. But as explained below, see infra note 9, the Court would be reluctant to exclude Dr. Aron's testimony even had DIRECTV failed to comply adequately with Rule 26.

9. The Court rejects Plaintiff's contention, at this relatively early stage in the case, that he would suffer prejudice were the Court to reopen discovery for the limited purpose of allowing Plaintiff to explore DIRECTV's EBR defense. See Pl.'s Opp'n to Def.'s Mot. for Leave to Amend [Doc. 86] at 16. See, e.g., Fitel, LLC v. Epstein, Becker & Green, P.C., 549 F.3d 1344, 1351 (11th Cir. 2008) (reversing the district court's refusal to reopen discovery where the plaintiff's failure to timely disclose his expert report pursuant to Rule 26 was substantially justified). Furthermore, even had DIRECTV failed to comply with Rule 26, the Court would be reluctant to cure this violation by excluding Dr. Aron's testimony rather than by reopening discovery. See Thornton v. United States, No. CV 111-106, 2013 WL 443666, at *8 (S.D. Ga. Feb. 5, 2013) (granting defendant's alternative request to reopen discovery in response to plaintiff's non-compliance with Rule 26 in lieu of the "harsh[ ] sanction" of dismissal); Vaughn v. United States, 542 F.Supp.2d 1331, 1337 (S.D. Ga. 2008) (declining to impose the "harsh sanction of exclusion" of expert testimony in response to plaintiff's Rule 26 violation); FED. R. CIV. P. 37(c)(1)(C) ("In addition to or instead of [dismissal], the court, on motion and after giving an opportunity to be heard, may impose other appropriate sanctions[.]").

10. By virtue of the Court's ruling, Plaintiff's Objection to the Expert Report of Dr. Debra J. Aron is **DENIED WITHOUT PREJUDICE.**

quirements of Rule 23, the Court must first address DIRECTV's claim that the IDNC Class lacks standing under Article III. See Def.'s Opp'n at 8–12. DIRECTV argues that, because the IDNC Class members are not alleged to have requested placement on Telecel's IDNC list, they could not have been "harmed"—i.e., suffered a cognizable injury in fact—by Telecel's failure to have minimum procedures in place to process and honor such requests. Id. at 8–9.

Article III standing consists of three elements: a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The burden is on the party invoking federal jurisdiction to establish these three elements. Id. at 561, 112 S.Ct. 2130; Palm Beach Golf Ctr.–Boca, Inc. v. John G. Sarris, D.D.S., P.A., 781 F.3d 1245, 1251 (11th Cir. 2015). Each element of standing must be supported with the "manner and degree of evidence required at the successive stages of litigation." Lujan, 504 U.S. at 561, 112 S.Ct. 2130.

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, Inc. v. Robins, —— U.S. ——, 136 S.Ct. 1540, 1548, 194 L.Ed.2d 635 (2016) (quoting Lujan, 504 U.S. at 560, 112 S.Ct. 2130). As the Supreme Court emphasized in Spokeo, however, courts must be cognizant of the fact that "[c]oncreteness ... is quite different from particularization." Id. An injury that is "particularized" is one that "affect[s] the plaintiff in a personal and individual way." Id. (quoting Lujan, 504 U.S. at 560, 112 S.Ct. 2130). An injury that is "concrete," by contrast, "must be 'de facto'; that is, it must actually exist ... [w]hen we have used the adjective 'concrete,' we have meant to convey the usual meaning of the term—'real,' and not 'abstract.'" Id. (internal citations omitted).

Nevertheless, an injury does not need to be tangible in order to be "concrete." Id. at 1549. "In determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles," and "Congress may 'elevat[e] to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law.'" Id. (quoting Lujan, 504 U.S. at 578, 112 S.Ct. 2130). However, because Article III standing requires a concrete injury even in the context of a statutory violation, a plaintiff does not automatically satisfy the injury-in-fact requirement "whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right," and "a bare procedural violation, divorced from any concrete harm," does not satisfy the requirements of Article III. Id. Thus, in Spokeo itself, the Supreme Court remanded after concluding that the Ninth Circuit had "failed to fully appreciate the distinction between concreteness and particularization" in finding that a violation of the plaintiff's statutory rights alone was sufficient to confer standing without also considering whether the plaintiff suffered any actual "harm." Id. at 1550. Specifically, the Court explained that the Ninth Circuit had failed to adequately explore whether Fair Credit Reporting Act violations alleged by the plaintiff were merely "procedural" in nature:

> In the context of this particular case, these general principles tell us two things: On the one hand, Congress plainly sought to curb the dissemination of false information by adopting procedures designed to decrease that risk. On the other hand, Robins cannot satisfy the demands of Article III by alleging a bare procedural violation. A violation of one of the FCRA's procedural requirements may result in no harm. For example, even if a consumer reporting agency fails to provide the required notice to a user of the agency's consumer information, that information regardless may be entirely accurate. In addition, not all inaccuracies cause harm or present any material risk of harm. An example that comes readily to mind is an incorrect zip code. It is difficult to imagine how the dissemination of an incorrect zip code,

without more, could work any concrete harm.

Id. (footnote omitted).

DIRECTV maintains that, even assuming Telecel violated 47 C.F.R. 64.1200(d) each time it made a call to a customer without the required IDNC procedures in place, Plaintiff has failed to allege that the IDNC Class members suffered anything more than a "bare procedural violation" within the meaning of Spokeo—i.e., that absent a showing the calls were unwanted (which class members could have indicated by requesting placement on the IDNC list), Plaintiff cannot establish that class members suffered a "concrete and particularized" injury. Def.'s Opp'n at 11. But the Eleventh Circuit has previously rejected the nearly indistinguishable argument that receipt of a "junk fax" sent in violation of the TCPA[11]—even where that fax is never printed or seen by its intended recipient—constitutes sufficient harm to provide standing. See Palm Beach, 781 F.3d at 1251–53. As the court explained in Palm Beach, Congress has made clear that a plaintiff need not suffer any monetary loss in order to recover statutory damages under the TCPA; instead, because processing a junk fax renders a person's fax machine temporarily unavailable, and because the TCPA was intended in part "to protect citizens from the loss of the use of their fax machines during the transmission of fax data," id. (citing H.R. REP. NO. 102–317, at 10 (1991)), the mere receipt of a junk fax is among those injuries "intended to be prevented by the statute and ... sufficiently personal or particularized to [plaintiff] as to provide standing." Id. at 1252.

Although the Eleventh Circuit has not revisited its holding in Palm Beach since Spokeo was decided, an overwhelming majority of courts (including at least one court in this district) have continued to hold that the mere receipt of faxes, telemarketing calls, and/or text messages in violation of the TCPA constitutes sufficient harm for purposes of Article III standing. See, e.g., Van Patten v. Vertical Fitness Grp., LLC, 847 F.3d 1037, 1043 (9th Cir. 2017) (holding that plaintiff's receipt of unsolicited text messages was a sufficient harm to confer standing, and explaining that, because "[u]nsolicited telemarketing phone calls or text messages, by their nature, invade the privacy and disturb the solitude of their recipients.... [a] plaintiff alleging a violation under the TCPA 'need not allege any additional harm beyond the one Congress has identified.'") (quoting Spokeo, 136 S.Ct. at 1549); O.P. Schuman & Sons, Inc. v. DJM Advisory Grp., LLC, No. CV 16-3563, 2017 WL 634069, at *2 (E.D. Pa. Feb. 16, 2017) (holding that plaintiff's mere receipt of junk fax constituted a sufficiently concrete and particularized harm to confer standing, rather than a "bare procedural violation" under Spokeo); Whiteamire Clinic, P.A. Inc. v. Cartridge World N. Am., LLC., No. 1:16CV226, 2017 WL 561832, at *3 (N.D. Ohio Feb. 13, 2017) (same); Swetlic Chiropractic & Rehab. Ctr., Inc. v. Foot Levelers, Inc., No. 2:16-CV-236, 2017 WL 373514, at *3 (S.D. Ohio Jan. 26, 2017) (same); Rogers v. Capital One Bank (USA), N.A., 190 F.Supp.3d 1144, 1147 (N.D. Ga. 2016) (concluding, post-Spokeo, that "[w]ith respect to the TCPA, the Eleventh Circuit has held that Congress intended to create a concrete injury where the statute was violated, meaning so long as the plaintiff has been affected personally by the conduct that violates the statute, standing exists.") (citing Palm Beach, 781 F.3d at 1252); but see ARcare v. Qiagen N. Am. Holdings, Inc., No. CV 16-7638 PA (ASX), 2017 WL 449173, at *3 (C.D. Cal. Jan. 19, 2017) (concluding that the plaintiff's receipt of unsolicited fax was not a sufficiently concrete and particularized harm because, even "had the faxes fully complied with the TCPA, plaintiff would have lost the same amount of ink, toner, paper, and time.") (internal quotation marks omitted).[12]

---

11. Subject to certain exceptions, 47 U.S.C. § 227(b)(1)(C) prohibits the "use [of] any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement[.]"

12. Although DIRECTV's urges the Court to follow ARcare, its holding appears to have been overruled by the Ninth Circuit's more recent decision (discussed supra) in Van Patten, 847 F.3d at 1043. See Def.'s Not. of Suppl. Authority [Doc. 85]. Furthermore, even were ARcare still good law, the Court finds its holding to be both

The same logic applies to unsolicited telephone calls: just as a junk fax renders a fax machine temporarily unavailable, a call placed in violation of the TCPA—whether or not a person has taken any affirmative steps to avoid it, like requesting placement on a caller's IDNC list—deprives its recipient of time, mental energy, and privacy. Indeed, in enacting the TCPA, Congress made specific findings that "unrestricted telemarketing can be an intrusive invasion of privacy" and a "nuisance," and gave consumers a private right of action to redress this harm even where they have suffered no monetary loss. Telephone Consumer Protection Act of 1991, Pub. L. 102–243, § 2, ¶¶ 5, 10, 12, 13, 105 Stat. 2394 (1991). Thus, the Court finds that "[u]nsolicited telemarketing phone calls or text messages, by their nature, invade the privacy and disturb the solitude of their recipients," and that a plaintiff alleging a violation under the TCPA therefore need not "allege any additional harm beyond the one Congress has identified" in order to establish Article III standing. Van Patten, 847 F.3d at 1043 (quoting Spokeo, 136 S.Ct. at 1549) (emphasis in original); see also Patriotic Veterans, Inc. v. Zoeller, 845 F.3d 303, 305–06 (7th Cir. 2017) ("Every [telemarketing] call uses some of the phone owner's time and mental energy, both of which are precious.").

The Court concludes that Plaintiff has alleged a sufficiently particularized and concrete injury in fact to confer Article III standing on the IDNC class members. Accordingly, because Plaintiff has properly alleged (1) an injury-in-fact (i.e., the invasion of privacy caused by unwanted calls [13]); (2) that these calls stemmed from DIRECTV'S unlawful conduct; and (3) that the injury may be redressed (by way of statutory damages), he has standing to represent the proposed classes.

### b. Whether the Proposed Classes Are Ascertainable

As explained above, a plaintiff seeking to represent a proposed class bears the burden of establishing that it is "clearly ascertainable." Little, 691 F.3d 1302. "[A] class is not ascertainable unless the class definition contains objective criteria that allow for class members to be identified in an administratively feasible way." Karhu v. Vital Pharm., Inc., 621 Fed.Appx. 945, 946 (11th Cir. 2015) (citing Bussey v. Macon Cty. Greyhound Park, Inc., 562 Fed.Appx. 782, 787 (11th Cir. 2014)). " 'Administrative feasibility' means 'that identifying class members is a manageable process that does not require much, if any individual inquiry.' " Bussey, 562 Fed.Appx. at 787 (quoting Newberg on Class Actions § 3.3 p. 164 (5th ed. 2012)). If a court cannot identify class members "without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." EQT Prod. Co. v. Adair, 764 F.3d 347, 358 (4th Cir. 2014); see also Sikes v. Teleline, Inc., 281 F.3d 1350, 1366 (11th Cir. 2002), abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008) (finding class certification unsustainable where claims would "involve extensive individualized inquiries on the issues of injury and damages.").

DIRECTV argues that Plaintiff's proposed classes are not ascertainable for several reasons. The Court will address these claims *seriatum.*

### i. Whether Plaintiff Can Adequately Identify Those Class Members Who Received a Call for the Purpose of Selling DIRECTV Services

Both of Plaintiff's proposed classes are defined to include persons who received calls from Telecel "for the purpose of selling or attempting to sell DIRECTV's services." Second Am. Compl. ¶¶ 68, 71. The viability of both classes hinges on this allegation because calls made for non-sales purposes (i.e. calls regarding installation, service, or bill payment) are not "telephone solicitations" or "telemarketing" calls within the meaning of the TCPA. See 47 C.F.R. § 64.1200(f)(12), (14).

---

anomalous and, more importantly, unpersuasive in light of the overwhelming contrary authority discussed above.

**13.** DIRECTV does not appear to dispute that a person suffers a cognizable injury-in-fact when he receives calls on his telephone while on the NDNC list. See Rogers, 190 F.Supp.3d at 1147.

As explained above, Plaintiff's allegations are based on an excel spreadsheet of outbound telephone calls placed by Telecel on behalf of DIRECTV from its El Salvador and Maryland call centers between March 27, 2015, and March 3, 2016. In a sworn affidavit submitted with Plaintiff's Motion for Class Certification, Fredy Diaz, Telecel's principal and custodian of records, states that "[t]he purpose of <u>each call</u> [listed on the spreadsheet] <u>included</u> marketing DIRECTV, LLC's services"—i.e., Diaz appears to state that *each* of the 60,506 calls identified by Plaintiff in the Complaint was made, in least in part, for the purpose of marketing DIRECTV's services. Telecel Aff. ¶ 3 (emphasis added). According to an affidavit submitted by G. Taylor Wilson, an attorney for plaintiff, this phrase was carefully negotiated with, confirmed, and ultimately agreed to by both Telecel's counsel and Diaz himself. <u>See</u> Aff. of G. Taylor Wilson in Supp. of Class Certification [Doc. 75–1] ("Wilson Aff.") ¶¶ 4–24. Plaintiff has submitted undisputed copies of the e-mails he exchanged with Telecel's counsel (including redlined drafts of Diaz's affidavit) that appear to support this claim. <u>See</u> E-mail exchanges between G. Taylor Wilson and Sterling Mead, Counsel for Telecel, attached as Exs. B–D of Wilson Aff. [Doc. 75–1] at 20–54.

DIRECTV responds that, contrary to Diaz's representations in the Telecel Affidavit, the call list relied upon by Plaintiff also includes calls *not* made for the purpose of marketing DIRECTV's services—and that, as a result, Plaintiff has no way of ascertaining which proposed class members actually received calls made for the purpose of marketing DIRECTV's services. Def.'s Opp'n at 13. In support of this claim, DIRECTV points to portions of deposition testimony taken subsequent to Diaz's Telecel Affidavit in which Diaz asserts, *inter alia*: (1) that Plaintiff's call spreadsheet includes calls made not only to market DIRECTV's services, but also calls to DIRECTV customers made for such purposes as checking on service and bill payment, Diaz Dep. at 39–41; (2) that the spreadsheet "does not distinguish between calls made trying to close a sale or make a sale and calls made for other purposes," Diaz Dep. at 41; and (3) that he has

no way to distinguish "which particular calls listed in [the] spreadsheet were made for the purpose of selling a DIRECTV service[,]" Diaz Dep. at 50. To explain the discrepancy between Diaz's Telecel Affidavit and his subsequent deposition testimony, DIRECTV implies that Diaz mistakenly agreed to the wording of the Telecel Affidavit, and has submitted a second affidavit from Diaz in which he states in part that "the more accurate statement with regard to paragraphs three (3) through six (6) of the [Telecel] Affidavit is that some of the calls listed in the exhibits were made with regard to marketing DIRECTV, because it is not possible to determine how many, or which ones of these calls were made for each such purpose." <u>See</u> Aff. of Fredy Diaz [Doc. 70–8] ¶ 6; Def.'s Opp'n at 14–16.

Another court recently rejected a similar argument in a proposed TCPA class action. In <u>Krakauer</u>, the defendant offered evidence that the plaintiff's proposed class, which was made up of individuals on the defendant's IDNC list, was overinclusive because the list was "not limited to individuals who asked not to be called, but also include[d] other individuals [defendant] [had] decided not to call for other reasons, such as allegations of rude behavior." 311 F.R.D. at 393. But the court rejected this claim, explaining that, if it "were to deny certification because Dish does not keep an accurate list as the regulations require and Dish itself cannot identify which individuals on the list actually requested not to be called, <u>it would create the perverse incentive for entities to keep poor records and to violate the TCPA's clear requirement that such a list be kept.</u>" Id. (emphasis added); see also Dish Network, 75 F.Supp.3d at 1014 n.21 (rejecting the defendant's similar argument that its IDNC list was "not properly maintained and updated," and explaining that, "if the [defendant] now admits that it has not instituted procedures to maintain a proper internal do-not-call list, then all of the 134,295,177 telemarketing calls identified in the 2007–2010 call records violate TCPA and the FCC Rule."); Carrera v. Bayer Corp., 2014 WL 3887938, at *3 (3d Cir. May 2, 2014) (Ambro, J., dissenting) ("Where ... a defendant's lack of records and business practices

make it more difficult to ascertain the members of an otherwise objectively verifiable low-value class, the consumers who make up that class should not be made to suffer.").

DIRECTV's argument that Plaintiff's call data may be overinclusive, and that the proposed class members are therefore not ascertainable, is similarly unpersuasive; indeed, DIRECTV's claim appears to amount to the insistence that, precisely *because Telecel flagrantly violated the TCPA* by not keeping adequate records—and therefore "cannot identify which individuals on the list" were called for the purpose of marketing—it should be effectively immune from class liability. But were the Court to take this argument seriously, it would create the same "perverse incentive" discussed in Krakauer, in effect permitting companies to create an almost foolproof shield against class liability simply by keeping vague or insufficiently detailed records. Indeed, even were the Court to credit its claims, DIRECTV appears to have produced no evidence that would allow either side's experts to discern what portion of the calls at issue were made for non-sales purposes, nor has it even asserted that such evidence exists. See Krakauer, 311 F.R.D. at 398 ("Moreover, to the extent Dish contends that the call records on which Dr. Krakauer relies are insufficient to allow Dish to identify every possible call to which it can assert this defense, that is not Dr. Krakauer's fault. If the records that Dish and its affiliates keep do not allow Dish to identify every possible EBR, that should not preclude persons with valid claims from recovering, nor does it prevent class certification under Rule 23(b)(3).").

▇▇▇ Furthermore, as the court explained in Krakauer, a plaintiff is not required to prove at the certification stage that, "without a doubt," every single person on the proposed class lists would be able to recover to satisfy the ascertainability requirement. Id. at 394; see, e.g., In re Nexium Antitrust Litig., 777 F.3d 9, 22 (1st Cir. 2015) ("In certifying a (b)(3) class there is an almost inevitable tension between excluding all non-injured parties from the defined class and including all injured parties in the defined class. Ideally, that tension should be resolved by adopting a class definition that includes no uninjured parties and excludes no injured parties. We doubt that this will be feasible in many cases. Without the benefit of further proceedings, it is simply not possible to entirely separate the injured from the uninjured at the class certification stage."). Instead, whether Plaintiff's list of persons in the IDNC and NDNC class lists will persuade a factfinder on the merits "is simply a common question of fact." Krakauer, 311 F.R.D. at 394 n.4.

### ii. Whether DIRECTV's Customer Relationships With Proposed Class Members Defeat Ascertainability

Next, DIRECTV argues that Plaintiff's proposed classes are not ascertainable because at least some—if not many—class members are likely DIRECTV customers who are either subject to arbitration agreements found in and/or who have an EBR with DIRECTV.[14] See Def.'s Opp'n at 16–17, 22–25. As explained above, a call is exempt from TCPA section at issue if the seller has an established business relationship with a residential subscriber, see 47 U.S.C. § 227(a)(4), (c)(3)(F); 47 C.F.R. § 64.1200(c)(2), (f)(5), (f)(14)(ii), and EBR is an affirmative defense for DIRECTV to prove. See Krakauer, 311 F.R.D. at 397. DIRECTV maintains that Plaintiff has made no attempt to identify and exclude these members of the class.

But as Plaintiff points out, it remains an open question whether DIRECTV customers—even those whose contracts contain an arbitration agreement—can nevertheless participate as class members: indeed, in another TCPA case in this district, Judge May recently held that telemarketing calls "attempt[ing] to sell a new DIRECTV service" were not within the scope of the plaintiff's arbitration agreement with DIRECTV. Holcombe v. DIRECTV, LLC, 159 F.Supp.3d 1337, 1344 (N.D. Ga. 2016).[15] Furthermore,

---

14. Both parties agree that this objection to ascertainability pertains only to the NDNC class.

15. It is unclear from the record whether those putative class members in this case who have entered into arbitration agreements with DI-

even if it becomes necessary to exclude DIRECTV customers from Plaintiff's proposed classes, it appears likely that this issue can also be resolved on a class-wide basis in a way that requires little individualized inquiry or fact-finding. As the court in <u>Krakauer</u> concluded when faced with a similar argument, the defendant's proposed EBR defense could be proved on a class-wide basis

> by, for example, offering a comprehensible customer list along with testimony about the list and which calls were to Dish customers; the factfinder could then determine whether those individuals as a group are not entitled to recover because of an EBR. To the extent there are a few situations where individual inquiry into the dates during which Dish is entitled to the EBR defense may be needed or where the parties dispute these dates, these issues appear to be easily manageable.

<u>Krakauer</u>, 311 F.R.D. at 398; <u>see also id.</u> at 399 (concluding that "the question of whether a putative class member was a Dish customer at the time of a call should be a simple and objectively verifiable task, requiring little more than reference to Dish's own records."). Although Plaintiff's expert, Anya Verkhovskaya—the same relied upon by the plaintiff in <u>Krakauer</u>—has so far been unable to complete this process without access to an unredacted version of the Matched Account List discussed above, the Court credits her statement that excluding those class members with an EBR is a "simple and commonly performed administrative task" that she has performed in several other cases by comparing basic customer information with underlying call records to exclude those individuals with possible EBR and/or other defenses.[16] <u>See</u> Rebuttal Expert Report of Anya Verkhovskaya [Doc. 75–1] ("Verkhovskaya Rebuttal Report") at 63–65.

Accordingly, the Court concludes that resolution of these defenses will involve neither "considerable individual inquiry" nor routine individual hearings in order to determine if a putative class member was a DIRECTV customer at the time of a call, and that Plaintiff has sufficiently demonstrated how DIRECTV can assert these defenses on a class-wide basis. <u>See Krakauer</u>, 311 F.R.D. at 398.

### iii. Whether Plaintiff Can Adequately Ascertain Which of the Phone Numbers Telecel Called Belonged to Residential Subscribers

Next, DIRECTV argues that the proposed classes also fail because Plaintiff has not attempted to ascertain which of the underlying telephone numbers belonged to residential, as opposed to business, subscribers; as DIRECTV points out, while Telecel is an authorized retailer for both residential and business accounts, the TCPA section at issue only prohibits calls to residential numbers. <u>See</u> Def.'s Opp'n at 18 (citing 47 C.F.R. § 64.1200(c)(2); <u>see also</u> 47 U.S.C. § 227(c)(5). However, DIRECTV submits no evidence in support of this claim, nor does it attempt to identify how many of the numbers in the proposed classes are associated with business accounts.

Based on the record before the Court, there is no indication that the proposed class list contains many such business numbers, or that these numbers are difficult to identify and exclude: in her rebuttal report, Verkhovskaya states that she has now used the services of a third-party data vendor, Nexxa-Group, to identify the telephone numbers of all putative class members associated with a business, and has determined from that analysis that "13 of the NDNCR-identified telephone numbers and, in total, 243 of the 24,566 unique telephone numbers from the call records dated March 27, 2015 to March 3, 2016, belonged to businesses." Verkhovskaya Rebuttal Report at 4–5.[17] Therefore, the Court finds that, to the extent this issue presents individual questions, these questions

---

RECTV (1) are subject to the same or similar agreements, or (2) whether those agreements are identical or substantially similar to the agreement at issue in <u>Holcombe.</u>

**16.** Indeed, it appears that the Court in <u>Krakauer</u> credited essentially the same methodology proposed here. <u>See id.</u> at 398.

**17.** Verkhovskaya explains that she did not perform this analysis in her original report because she evidently presumed that Telecel "made telephone calls to individuals, rather than to businesses, when it marketed DIRECTV services to individual customers." <u>Id.</u> at 4.

"appear few in number, straightforward, and peripheral to the central issues in this litigation[.]" Krakauer, 311 F.R.D. at 397 (concluding that even if the resolution of this same question "require[d] some individualized inquiry," the issues it raised were "not complex and are entirely manageable").[18]

### 2. Whether the Requirements of Rule 23(a) are Met

#### a. Numerosity

Rule 23(a)(1) provides that a class is sufficiently numerous if "joinder of all parties is impractical." Although "mere allegations of numerosity are insufficient," Rule 23(a)(1) imposes a "generally low hurdle," and "a plaintiff need not show the precise number of members in the class." Vega v. T–Mobile USA, Inc., 564 F.3d 1256, 1267 (11th Cir. 2009) (citations omitted). "[W]hile there is no fixed numerosity rule, generally less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors." Cox v. Am. Cast Iron Pipe Co., 784 F.2d 1546, 1553 (11th Cir. 1986) (internal quotation marks omitted).

Here, Telecel's records show calls to 926 numbers on the NDNC Registry, and 16,870 calls placed to numbers while Telecel did not maintain and IDNC list. This amount is large enough for the Court to presume that joinder would be impractical. Therefore, Plaintiff has met the numerosity requirement.

#### b. Commonality

Plaintiff bears the burden of "demonstrat[ing] that the class members have suffered the same injury." Wal–Mart, 564 U.S. at 350, 131 S.Ct. 2541 (quotations omitted). However, "[t]his does not mean merely that they have all suffered a violation of the same provision of law." Id. Instead, "claims must depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determi-

nation of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id. Ultimately, however, the commonality test presents a "low hurdle" for plaintiffs, Williams v. Mohawk Indus., Inc., 568 F.3d 1350, 1356 (11th Cir. 2009), because "for purposes of Rule 23(a)(2) even a single common question will do," Carriuolo v. Gen. Motors Co., 823 F.3d 977, 984 (11th Cir. 2016) (quoting Wal–Mart, 564 U.S. at 359, 131 S.Ct. 2541).

Plaintiff contends that commonality is satisfied here because the following issues of fact are capable of proof by evidence common to every class member: (1) whether all of the calls at issue for the NDNC class were made to telephone numbers on the NDNC registry and (2) whether all of the calls at issue for the IDNC class were made while Telecel did not have the required IDNC procedures in place. Pl.'s Mot. for Class Certification at 15–16. Although DIRECTV insists that the litigation of "secondary questions" related to the purpose of individual DIRECTV calls and/or DIRECTV's proposed EBR defense will predominate in this litigation—and thus undermine Plaintiff's claim that his common contentions are "capable of classwide resolution"—the Court rejects these claims for the same reasons discussed above.

Accordingly, the Court finds that, given these common issues, Plaintiff has met the commonality requirement.

#### c. Typicality

Rule 23(a)(3) requires that the class representative's claims or defenses be "typical of the claims or defenses of the class." "A class representative must possess the same interest and suffer the same injury as the class members in order to be typical[.]" Cooper v. S. Co., 390 F.3d 695, 713 (11th Cir. 2004), overruled on other grounds, Ash v. Tyson Foods, Inc., 546 U.S. 454, 457, 126 S.Ct. 1195, 163 L.Ed.2d 1053 (2006) (citation omitted). "[T]ypicality measures whether

---

**18.** For the same reason, the Court also rejects DIRECTV's contention that Plaintiff's identification of telephone numbers—rather than *persons*—called more than once renders the class unascertainable. See Def.'s Opp'n at 18–19. As Verkhovskaya explains in her rebuttal report, she

is able to identify those individuals who received two or more calls using a process known as historic reverse-append, and has previously done so in past litigation (including in Krakauer). Verkhovskaya Rebuttal Report at 6 & n. 5.

a sufficient nexus exists between the claims of the named representatives and those of the class at large." Id. (quoting Prado–Steiman ex rel. Prado v. Bush, 221 F.3d 1266, 1279 (11th Cir. 2000)).

The Court agrees with Plaintiff that his claims are typical of the claims of all class members because they arise from the same course of conduct: Plaintiff alleges that, like all putative class members, he received telemarketing calls from Telecel both (1) while registered on the NDNC Registry, and (2) while Telecel did not have procedures in place for maintaining and IDNC list. Typicality is therefore satisfied.

### d. Adequacy of Representation

Finally, Rule 23(a)(4) requires that both the named plaintiffs and their counsel will "fairly and adequately protect the interests of the class." "This 'adequacy of representation' analysis encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." Valley Drug Co. v. Geneva Pharm., Inc., 350 F.3d 1181, 1189 (11th Cir. 2003) (internal quotation marks omitted).

Here, neither Plaintiff nor his counsel appear to have any interests that are antagonistic to the proposed classes. Furthermore, Plaintiff's counsel appear to possess the necessary qualifications and experience to serve as class counsel.

Accordingly, Plaintiff has met his burden of meeting the requirements of Rule 23(a).

### 3. Whether the Requirements of Rule 23(b)(3) are Met [19]

In addition to satisfying the elements of Rule 23(a), Rule 23(b)(3) requires Plaintiff to establish (1) that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and (2) that "a class action is superior to other available methods for fair and efficient adjudication of the controversy."

### a. Predominance

To satisfy the predominance prong of Rule 23(b)(3), Plaintiff must show that "the issues subject to generalized proof in the class action, and thus applicable to the class as a whole, predominate over the issues that are subject only to individual proof." Rutstein v. Avis Rent–A–Car Svs., Inc., 211 F.3d 1228, 1233 (11th Cir. 2000) (quoting Kerr v. City of W. Palm Beach, 875 F.2d 1546, 1558 (11th Cir. 1989)). "Common issues can predominate only if they have a direct impact on every class member's effort to establish liability that is more substantial than the impact of individualized issues in resolving the claim or claims of each class member." Carriuolo, 823 F.3d at 985. By contrast, common issues do not predominate if, "as a practical matter, the resolution of [an] overarching common issue breaks down into an unmanageable variety of individual legal and factual issues," Andrews v. Am. Tel. & Tel. Co., 95 F.3d 1014, 1023 (11th Cir. 1996), and certification is inappropriate if the "plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims," Klay v. Humana, Inc., 382 F.3d 1241, 1255 (11th Cir. 2004), abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008). In determining whether class or individual issues predominate in a putative class action suit, courts "must take into account 'the claims, defenses, relevant facts, and applicable substantive law' to assess the degree to which resolution of the classwide issues will further each individual class member's claim against the defendant." Id. (quoting Castano v. Am. Tobacco Co., 84 F.3d 734, 744 (11th Cir. 1996)).

Plaintiff maintains that the resolution of this litigation will be determined by a straightforward set of questions common to all class members, questions that pertain largely to DIRECTV and Telecel's course of conduct—in particular, whether Telecel (1) called telephone numbers registered to the NDNC registry, and/or (2) called members of the putative IDNC class while it did not have

---

**19.** Both parties address their briefing only to this subsection of Rule 23(b).

procedures in place for maintaining an IDNC list. Pl.'s Mot. for Class Certification at 20–21. In response, DIRECTV argues that, even were Plaintiff to establish that there are common questions in this litigation, numerous individualized issues would ultimately predominate in this litigation, including: (1) whether individual customers had arbitration agreements and/or EBRs with DIRECTV; (2) whether individual calls were made to customers for marketing or non-marketing purposes; and (3) whether individual phone numbers identified by Plaintiff belonged to residential as opposed to business subscribers. See Def.'s Opp'n at 22–25.

But as explained above, none of the issues DIRECTV identifies precludes class certification. As the court concluded in Krakauer when faced with a similar set of arguments:

> [T]he question of whether a putative class member was a Dish customer at the time of a call should be a simple and objectively verifiable task, requiring little more than reference to Dish's own records. Dish's claim that the putative class list contains "hundreds" or "a multitude" of non-actionable calls, is not supported by evidence. While there are potentially a number of individual issues, these issues appear to apply to only a small number of class members and are straightforward. These minor, peripheral issues do not defeat the predominance of the central issue: whether the calls were made by Dish's agent.

Krakauer, 311 F.R.D. at 399 (emphasis added). Here, as set forth in more detail above, it appears that the individual issues DIRECTV identifies will be similarly amenable to resolution by fairly "simple and objectively verifiable" means.

Accordingly, the Court finds that common questions of law and fact predominate.

#### b. Superiority

 Finally, Rule 23(b)(3) requires that Plaintiff show that a class action is superior to other available methods for the fair and effective adjudication of the controversy. The focus of this inquiry is on "the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." Klay,

382 F.3d at 1269. The predominance analysis "has a tremendous impact on the superiority analysis ... for the simple reason that, the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims." Id. The matters pertinent to a court's findings under Rule 23(b)(3) include: (1) the class members' interests in individually controlling the prosecution of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by other members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action. FED. R. CIV. 23(b)(3).

 Given the relatively small amount of damages provided by the TCPA, the Court finds class members are likely to have little interest in controlling the litigation in this case. See Krakauer, 311 F.R.D. at 400. There is no evidence of any litigation begun by or against any class members here, and the sheer number of class members at issue makes class-wide adjudication of Plaintiff's claims more efficient. Id. Furthermore, the individual issues identified by DIRECTV do not appear to present serious difficulties in managing the class or adjudicating these claims in one forum, which otherwise "would provide flexibility, control, and consistency that would not exist without individual litigation." Id. Indeed, other courts have found TCPA cases to be uniquely well-suited to class resolution. As one district court recently explained in certifying a junk fax class action:

> It is the view of this Court that the instant case highlights one of the strongest justifications for the class action device: its regulatory function. A statute such as the TCPA, which provides for a relatively small recovery for individual violations but is designed to deter conduct directed against a large number of individuals, can be effectively enforced only if consumers have available a mechanism that makes it economically feasible to bring their claims. Without the prospect of a class action suit,

corporations balancing the costs and benefits of violating the TCPA are unlikely to be deterred because individual claims will not impose the level of liability that would outweigh the potential benefits of violating the statute. This, of course, does not relieve Plaintiffs of their burden to meet the requirements for class certification under Rule 23. But Rule 23 analysis should be conducted in light of the objectives of the statute at issue, not in a vacuum devoid of policy context. In the context of the TCPA, the class action device likely is the optimal means of forcing corporations to internalize the social costs of their actions.

Bee, Denning, Inc. v. Capital All. Grp., 310 F.R.D. 614, 630 (S.D. Cal. 2015) (internal citations omitted); see also Jay Clogg Realty Grp., Inc. v. Burger King Corp., 298 F.R.D. 304, 309–10 (D. Md. 2014) ("[I]f the goal of the TCPA is to remove a 'scourge' from our society, it is unlikely that 'individual suits would deter large commercial entities as effectively as aggregated class actions and that individuals would be as motivated ... to sue in the absence of the class action vehicle.' ") (quoting Landsman & Funk PC v. Skinder-Strauss Assocs., 640 F.3d 72, 95 (3d Cir. 2011)).

Accordingly, the Court finds that a class action is superior to other methods of litigation.

## IV. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Plaintiff Sebastian Cordoba's Motion for Class Certification [Doc. 63] and Defendant DIRECTV, LLC's Motion for Leave to Amend its Answer [Doc. 82] are **GRANTED.** Plaintiff's Objection to the Expert Report of Dr. Debra J. Aron [Doc. 74] is **DENIED WITHOUT PREJUDICE.**

As explained above, it is further **ORDERED** that DIRECTV disclose the Matched Accounts List to Plaintiff pursuant to the procedures set forth in U.S.C. § 338(i)(4)(B)(ii). Once Plaintiff has received that list, the Court **ORDERS** that discovery be reopened for a period of time not to exceed 30 days for the limited purpose of allowing Plaintiff to explore DIRECTV's EBR defense. The parties are **DIRECTED** to attempt to reach an agreement concerning these issues, and to submit a joint stipulation and proposed order to effectuate this process.

**IT IS SO ORDERED** this 12th day of July, 2017.